## ISOARD v. MUTUAL LIFE INS. CO. OF NEW YORK.

Circuit Court of Appeals, Eighth Circuit.
December 5, 1927.

No. 7814.

Insurance ☜515—Death of insured, who carrying gun, sought personal enemy and was killed in exchange of shots, held not "accidental," within double liability clause.

Where insured left his house armed with expectation of meeting another man with whom he had quarreled, and whom he did meet, and in the exchange of shots, was killed, his death was not "accidental," within the double liability clause of the policy.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Accident—Accidental.]

In Error to the District Court of the United States for the District of Utah; Tillman D. Johnson, Judge.

Action at law by Georgia Isoard against the Mutual Life Insurance Company of New York. Judgment for defendant, and plaintiff brings error. Affirmed.

James A. Howell, of Ogden, Utah (Joseph E. Evans, James H. De Vine, David L. Stine and Alfred W. Agee, all of Ogden, Utah, and Thomas D. Jones, of Pocatello, Idaho, on the brief), for plaintiff in error.

W. Q. Van Cott, of Salt Lake City, Utah (Frederick L. Allen, of New York City, and Waldemar Van Cott, P. T. Farnsworth and B. R. Howell, all of Salt Lake City, Utah, on the brief), for defendant in error.

Before LEWIS, Circuit Judge, and POLLOCK and SCOTT, District Judges.

POLLOCK, District Judge. This action was brought by plaintiff in error, plaintiff below, to recover double the amount of indemnity named in a policy of insurance issued to one Ludovic Isoard, the husband of plaintiff, for $10,000. The provision of the policy under which plaintiff claims a right of recovery reads, as follows:

"Or, if there further be received at said home office due proof that such death resulted directly from bodily injury, received after the date of issue of this policy, independently and exclusively of all other causes, and that such bodily injury was effected solely through external, violent, and accidental means, and that such death occurred within 60 days after the death of such bodily injury, promises to pay to said beneficiary, instead of the face amount of this policy, $20,000 (double the face amount of this policy, herein called double indemnity): Provided, however, that this double indemnity shall not be payable in the event of the insured's death as a result of military or naval service in time of war, nor shall it be payable in the event of the insured's death at any time by his own act, whether sane or insane, nor if such death be caused directly or indirectly, wholly or partly, by riot, insurrection, or war, or any act incident thereto, nor if such death be a result of participation in aeronautics or submarine operations, nor if such death result from any violation of law by the insured, or from police duty in any military, naval, or police organization, or directly or indirectly from bodily or mental infirmity or disease of any sort. The company shall have the right and opportunity to examine the body and to make an autopsy, unless prohibited by law."

The answer denied the deceased came to his death "as a result of external, violent, and accidental means." And, as seen, the policy further contains a provision under which the defendant would not be liable for the double indemnity in case the death of the insured resulted from any violation of law by the insured, and it was alleged in defense that the death of the insured did so result.

At the conclusion of all the evidence, on a trial before the court and a jury, the trial court sustained a motion for a directed verdict. Plaintiff below brings error. While there are many assignments of error they all come in the end to one proposition: Did the trial court err in its ruling directing a verdict for defendant, or should the court have submitted the case to the jury? The evidence is brief, from which the following facts are established:

Deceased was shot and killed on the morning of November 28, 1925, by one Walter Chadwick. There was, as shown by the evidence, bad blood between the parties, and some short time before this date there had been a quarrel between them. It abundantly appears from the evidence deceased was jealous of attentions shown, or by deceased thought to have been shown, by Chadwick to his wife. It is evident, on the afternoon of the day before the killing, the deceased believed his wife was absent from their home in company with Chadwick, for when she returned home deceased had his gun, and remarked, in effect, if Chadwick had come with her, he would have killed him. The next morning deceased cleaned his shotgun and left the home, his wife pleading with him not to take his gun; but he took it, left, procured some shells, and went over and upon a farm belonging to a relative of Chadwick, where he encountered Chadwick. The only evidence as

to the direct encounter between them comes from the slayer, Chadwick, as follows:

"A. We greeted each other.

"Q. And then what? A. I asked him what he was doing down there.

"Q. What did he reply? A. 'Hunting.'

"Q. And what did you say? A. I asked him if he was sure he wasn't snooping around again.

"Q. And what did he say? A. I don't remember the exact words now. He asked me if I told his wife about being down in the barn.

"Q. What did you answer? A. 'Yes.'

"Q. And what did he say then? A. 'You won't tell any one else.'

"Q. Did he address you by a name at that time? Did he call you a name in that same conversation? A. Yes, sir.

"Q. State it please. A. 'You son of a bitch, you won't tell any one else.'

"Q. What occurred then? A. It is hard for me to go back into that, but Isoard started to raise his gun, and I shot.

"Q. Towards which shoulder did he start to raise his gun? A. The left.

"Q. After you shot what happened? A. I never did have no clear recollection after the first shot.

"Q. Do you recall whether or not his gun went off? A. I thought it did.

"Q. It is your recollection that it did? A. Yes, sir.

"Q. Do you recall, after the first shot, whether or not he was working his gun? A. I never did have a clear recollection after the first shot."

In this evidence, the question asked by deceased of Chadwick, whether he (Chadwick) had told plaintiff, his wife, about being down to the barn, meant had he told her of their previous quarrel which had taken place at the barn. In fact, Chadwick had been arrested, charged, and tried for the murder of the deceased, at which trial the plaintiff, the wife of the deceased, had appeared and testified in behalf of the slayer of her husband, and Chadwick had been convicted of a low decree of manslaughter; from all of which, it must be thought the feeling between Chadwick and plaintiff was a little deeper than purely platonic; that the reason deceased went armed on the morning of his death was in the belief he might meet Chadwick, and the reason Chadwick went armed was to protect himself in case he should encounter deceased. Taking all the evidence in its natural sequence, we think the trial court was right in holding the encounter was brought on voluntarily by the deceased, therefore, what hap-

pened to deceased was voluntary, not accidental, and under the long-established rule of this court (Taliaferro v. Travelers' Protective Ass'n, 80 F. 368), plaintiff could not recover.

A further insistence is made by plaintiff that, although the encounter may have been instigated by deceased, yet the evidence shows, after he had received the first shot from Chadwick, he attempted to retire from the conflict; hence, the last and probably the fatal shot was accidental. This contention is based solely and alone on two pieces of evidence found in the record: First, the 33 feet of blood stains found on the bank of the sewer outlet, and which it is contended shows deceased fled thus far from the time he received the first shot until the second was received; second, from the appearance of the body of the deceased after death, and the wounds thereon, tending to show he was standing with his back to Chadwick when the fatal shot was received. But, as held by the trial court, all that can be gleaned from these facts amounts to mere speculation, guess, or probability. The burden of proof rested upon the plaintiff. While the contention here made by plaintiff may be true, yet the proof offered in its support is purely circumstantial, and is not of such nature as to exclude many other reasonable hypotheses, and hence proves nothing.

At the time the proofs of death were made, the defendant company paid the face value of the policy and interest into court for plaintiff. The double indemnity claimed in this case can only be allowed plaintiff on condition she established the fact the death of her husband was the "result of external violent and accidental means." The record fails to disclose the death was accidental.

The judgment is right, and is affirmed.