HANDLEY v. MUTUAL LIFE INS. CO. OF NEW YORK

No. 6626. Decided March 15, 1944. (147 P. 2d 319.)

See 17 C. J. S. Contracts, sec. 324; 29 Am. Jur. 707.

*Farnsworth & Van Cott* and *Grant H. Bagley,* all of Salt Lake City, for appellant.

*W. Dean Loose,* of Provo, and *Elias Hansen,* of Salt Lake City, for respondent.

WOLFE, Chief Justice.

The plaintiff, Maud C. Handley, brought this action to recover the accidental death benefits provided for in a life insurance policy upon the life of her deceased husband Ralph Handley. The plaintiff undertook to plead two causes of action: First, that the defendant, the Mutual Life Insurance Company of New York, had breached the double indemnity provisions of a life insurance policy; and second, that the defendant had breached a subsequent oral agreement under which it had promised to pay plaintiff the double indemnity benefits if plaintiff would consent to an autopsy on the body of her husband and if said autopsy confirmed the plaintiff's theory concerning the cause of the death. The trial court found in favor of the plaintiff on both theories and the defendant appealed.

For the most part the facts are not in dispute. The insured was a farmer, 53 years of age. His health was normal for a man of that age. His own physician testified that during the seven years prior to his death he had known decedent to be in "unusually good health. He was a very healthy man." He died on December 13, 1941, of pulmonary embolism following a surgical operation for the reduction of a hernia. The hernia was caused by an accident which occurred on August 1, 1941, when a heavy steel bar which had been leaning against a shed fell and struck the insured in the left groin. At the time of the accident, a doctor was called to treat the defendant for the hernia. The doctor permitted the insured to remain at his work.

On November 24, 1941, the insured had surgical treatment for the hernia. An operation was performed on that date

by a competent surgeon. Standard operative procedure was followed in performing the operation. There were no slips or mishaps and the insured had a normal post-operative recovery. Yet he died very suddenly on December 13, 1941. The evidence clearly established that the death was due to what Dr. Anderson, testifying for the plaintiff, described as a coronary occlusion. Dr. Ogilvie, testifying for the defendant, more specifically described it as a pulmonary embolism, since the autopsy showed the embolism to have landed in the lung where it blocked the blood passages and caused the blood to pour into the air sacs. Medical experts testified that the thrombi or clots originated in the vein directly behind the operative site and were a direct result of it. This death was considered to be unusual by the medical experts and would be considered an accident from a surgical standpoint.

The contract of insurance provided that:

"The Mutual Life Insurance Company of New York will pay to the insured's wife, Maud C. Handley, the beneficiary, One Thousand Dollars upon receipt of due proof of the death of Ralph Handley, the Insured. * * *."

The policy also provided that the Insurance Company would pay the beneficiary Two Thousand Dollars,

"upon receipt of due proof that the Insured died as a direct result of bodily injury effected solely through external, violent, and accidental means, independently and exclusively of all other causes, and of which, * * * there is evidence by a visible contusion or wound on the exterior of the body, and that such death occurred (a) within ninety days after the date of such injury, * * *."

The principles which govern this case may be more intelligently discussed by considering in three periods the pathological history of Mr. Handley from the time he was struck by the steel bar to his death. First, the period from the accident which resulted in the hernia to the time of operation extending from August 1st to November 24, 1941;

second, the operation for the correction of the hernia; third, the period extending from the operation to the death.

The defendant contends that all three periods are a unit in that they are all links in a chain of cause and effect extending from the blow of the steel bar to the death; that the corrective operation was a natural, ordinary and proper effect of the hernia which itself was the consequence of the blow; that the unexpected results of the operation, to wit, death, was therefore immediately caused by the blow but since death resulted more than ninety days from the time of the blow it did not occur directly from "external, violent and accidental means" within the 90 day period. We may admit for the purposes of answering this contention that within the meaning of the double indemnity provisions of the policy, death was caused by the blow and that the operation was not an intervening cause, but this does not relieve us from a consideration and determination of the question as to whether the death more immediately caused by the operation was not one which was a "direct result of bodily injury effected solely through external, violent and accidental means, independently and exclusively of all other causes." These causes from the blow to the death through the operation are linked up in series not in parallel. We are not here concerned with two causes operating concurrently but side by side so as to require a determination of which was the effective, preponderating cause. Death may be the result of an external, violent and accidental cause which itself may be considered to be the consequence of an antecedent event, which event would then be the mediate cause of death. We cannot escape consideration of the question posed by this appeal; that is, whether the death which resulted from a surgical operation may be said to have been due to a "bodily injury effected solely through the operation as the external violent and accidental means" as those terms have been construed by the decisions of the courts and especially of this court.

We go directly to that question which concerns the second and third periods of Handley's pathological history. Defend-

ant concedes that the operation was an external and violent means but that everything that was there done was intended and therefore not accidental. In its own language it is contended that

"the surgical operation which plaintiff asserts was the bodily injury which resulted in the death of the insured was in no sense an accident. It was a purely intentional act freely and voluntarily consented to by the patient. It was performed precisely as designed and intended. The result was neither unnatural nor unforeseeable. The doctor knew that the result which did occur might occur without the intervention of any fortuitous event. Pulmonary embolism is a very common cause of death."

The plaintiff admits that the operation was intended and performed according to calculations and without slip or mishap in its performance but contends that the embolis which floated into the pulmonary artery and caused death was an unexpected result of the operation. She further asserts that under our decisions an unexpected result from an intended act has been construed to come within the provisions such as are contained in this policy. To this the defendant answers that

"whether there should be a distinction between a policy which insures against death from injuries sustained through accidental means and one which insures against death from injuries sustained by accident is unnecessary to determine. In either case it would extend the coverage of the policy far beyond the clear intention of either the company or the insured to hold that the natural and direct *result* of a purely intentional and voluntary act is caused by accident or by accidental means whenever it can be said that some other *natural* result occurs more frequently." (Italics added.)

No doubt when insurance companies designed the clause herein contained in this policy and similar clauses they intended that there should be a sequence of first an injury produced by external violent or accidental means or accidental event which injury would in turn produce death. The external, violent and accidental means were to precede and directly cause the injury and the injury was to precede and directly cause the death independent of

all other causes. "Direct result" does not mean immediate result of the injury. It is sufficient if the injury is the mediate, efficient cause. Where there is a definite sequence or causal chain from accident causing the injury to the death without independent intervening circumstances which co-operate adequately and efficiently to make the death result also from such causes, the death is a direct result of the injury. *Browning* v. *Equitable Assur. Soc.*, 94 Utah 532, 72 P. 2d 1060, and cases cited and discussed therein; and Id., 94 Utah 570, 80 P. 2d 348. But the words of the provision under discussion when accurately read can mean only that the accident—external and violent—must precede and produce the injury which must in turn precede and produce death. In spite of this plain, clear meaning of the words, courts manned by able and understanding judges, have construed the passage to cover situations where the means or cause was not accidental although violent and external and the results were accidental in the sense that they were not contemplated or expected. A partial list of the cases so holding and those refusing to hold is contained in the case of *Zinn* v. *Equitable Life Insurance Company of Iowa,* 6 Wash. 2d 379, 107 P. 2d 921, and in 90 A. L. R. 1382. The courts which construed the provision as including an unforeseen and unexpected result from an intended act, while attempting at times logically to sustain the construction as consistent with the language, have really been influenced by the fact that insurance policies are sold to the public without opportunity or capability on the part of the insured to analyze the refinements of meaning and that they are purchased with the understanding that if death results from an unintended or an intended cause where it was not the expected but the supposedly improbable result it was covered by the policy. "Our point of view in fixing the meaning of the contract must not be that of the scientist. It must be that of the average man," says Cardoza in *Lewis* v. *Ocean Accident & Guar. Corp.,* 224 N. Y. 18, 120 N. E. 56, 57, 7 A. L. R. 1129. See also *Zinn* v. *Equitable Life Ins. Co. of Iowa,* supra; *Richards* v. *Standard Accident Ins. Co.,* 58 Utah 622, 200 P. 1017, 17

A. L. R. 1183. It is to be granted that a contract in case of ambiguity must be construed against the party who drew it and especially is this so in the case of contracts which are sold widely to the average man under sales talk which cannot be too technical in its expositions and yet which very easily lull him into a belief that he has purchased certain benefits which on closer scrutiny of the contract are asserted not to be included. But the writer has some doubt as to whether the construction of provisions like the one under discussion have not been liberalized beyond the point justified by a supposed ambiguity or by the principle that the burden is on the draftsman of the contract. The phrases seem to be accurately expressed. The great majority of accidental disablements and deaths would come within its provisions. Since insurance rates are based on actuarial experience it might have been served better to keep down the rates so as to bring this type of insurance within the range of more people, even though one here and there was denied recovery, than to include those not intended to be covered. On the other hand, it may be better to charge a greater premium and insure the holders of the policy in cases where they may reasonably think they are insured. But we cannot turn back the clock. This court has definitely gone on record as construing the provision under discussion and equivalent provisions as reaching cases where the death or disablement is the unexpected result, intended acts making the result itself, rather than the means, the accident. In *Richards* v. *Standard Accident Ins. Co.*, supra, the court construed sunstroke to be an injury. The extra unexpected walk to and from the mine which caused Richards to be exposed to the sun instead of finishing the trip by night, was taken to be the accidental means which preceded and which caused the injury of sunstroke.

If such extra unanticipated journey may be thought of as an accidental and violent means of causing the sunstroke the decision at least may be reconciled to the meaning of the provision that the accidental means must precede the injury. But this court in that decision evidently was in

some doubt as to whether the extra journey was the *accidental* cause of the injury of sunstroke. Having determined that sunstroke was an injury it chose also to rest the decision on the ground that even though the extra journey was not accidental but intended the *result* was unexpected, unanticipated and therefore accidental. The decision quotes from Judge Sanborn's decision in the case of *Western Commercial Travelers' Ass'n* v. *Smith*, 85 F. 401, 29 C. C. A. 223, 56 U. S. App. 393, 40 L. R. A. 653, as follows [58 Utah 622, 200 P. 1023, 17 A. L. R. 1183]:

" 'The significance of this word "accidental" is best perceived by a consideration of the relation of causes to their effects. The word is descriptive of means which produce effects which are not their natural and probable consequences. The natural consequence of means used is the consequence which ordinarily follows from their use—the result which may be reasonably anticipated from their use, and which ought to be expected. The probable consequence of the use of given means is the consequence which is more likely to follow from their use than it is to fail to follow. An effect which is the natural and probable consequence of an act or course of action is not an accident, nor is it produced by accidental means. It is either the result of actual design, or it falls under the maxim that every man must be held to intend the natural and probable consequence of his deeds. On the other hand, an effect which is not the natural or probable consequence of the means which produced it, an effect which does not ordinarily follow and cannot be reasonably anticipated from the use of these means, an effect which the actor did not intend to produce, and which he cannot be charged with the design of producing under the maxim to which we have adverted, is produced by accidental means. It is produced by means which were neither designed nor calculated to cause it. Such an effect is not the result of design, cannot be reasonably anticipated, is unexpected, and is produced by an unusual combination of fortuitous circumstances; in other words, it is produced by accidental means.' "

This same language is repeated in the case of *Billings* v. *Continental Life Insurance Co.*, 81 Utah 572, 21 P. 2d 103, although it would seem that in that case the truck driver striking the pavement on reaching out for some purpose and the septicemia which caused death was due to the violent external and accidental introduction of infection through the flesh wound caused by the fall. It is not clear why it was

necessary in that case to place the decision on the ground of accidental and unexpected result. In *Carter* v. *Standard Accident Ins. Co.*, 65 Utah 465, 238 P. 259, 41 A. L. R. 1495, written before the Billings case, this court repudiated the distinction attempted to be made by the insurer between "accidental death" and death by "accidental means," citing the Richards case.

The case of *Whatcott* v. *Continental Casualty Co.*, 85 Utah 406, 39 P. 2d 733, cannot be distinguished from the instant case except by refinements which would be untenable and confusing. There it was intended to inject the novocain. It produced a result which was unexpected and unforeseen. The operation in this case was intended as was the injection in the Whatcott case. To apply the language voicing the contentions of the appellant in this case to the Whatcott case, the injection was purely intentional, an act freely and voluntarily consented to by the patient. It was performed precisely as designed and intended. The doctor "knew that the result which did occur might occur without the intervention of any fortuitous event." In that sense the result was neither unnatural nor unforseeable. It is true that pulmonary embolism is a very common cause of death but pulmonary embolism resulting from operation like death from novocain infection is not a very common cause of death when compared to the great number of times it is used without such result.

In the Whatcott case it was stated that the policy in that case differed from the language of the policy involved in the cases of *Richards* v. *Standard Accident Ins. Company,* supra, and in the case of *Carter* v. *Standard Accident Ins. Company,* supra, and *Billings* v. *Continental Life Ins. Co.,* supra, in that in the Whatcott case the policy insured against the happening of an accidental event, whilst in the other three cases the policy covered, as in the case at bar, injuries directly caused by accidental means. We have examined the records on file in this court for the language of the policy involved in the Whatcott case. It provided for payment in the event of "death resulting from personal bodily injuries

effected solely and independently of all other causes by the happening of an external, violent and purely accidental *event* \* \* \*." (Italics added.) This court in the Whatcott case evidently drew a distinction between the phrase "effected by the happening of an \* \* \* accidental event" and the phrase "effected through \* \* \* accidental means," basing it on an observation made by the Circuit Court of Appeals for the Fourth Circuit in the case of *Continental Casualty Co.* v. *Willis*, 28 F. 2d 707, at page 708, 61 A. L. R. 1069. We are unable to follow the reasoning on which this distinction is based. In both cases the "injury" must be *effected* by an "accidental event" or by "accidental means." The court of appeals apparently overlooked the fact that in both cases the language requires the "event" or "means" to precede the injury. We cannot, then, see how because it is said that "event is the culmination or end that the 'means' may have produced or brought about," a cause can be turned into a result. We do not think the Whatcott case can be distinguished from the case at bar. It might be possible to find some distinctions in the directness or indirectness in the path of pathological events but the distinction would be invalid and confusing for purposes of the law.

It is quite possible if we knew more definitely how this embolus was formed and its direct causes we might find that the third period of the pathological history of this case would itself satisfy the provisions of this policy. While the doctors definitely related the emboli to the operation, both of them testified that the reasons why emboli result from operations were not definitely known to the profession. Their causes lay in the realm of conjecture, whether due to a bruise of the vein due to operation or some difference in timing of the coagulation of the blood or other cause they could not say. If the manipulations of the operation caused pressure which either itself broke from an existing thrombosis near the situs of the operation an embolus or emboli or if the pressures caused a thrombosis to form because it made the arteries near there susceptible to their formation, this part of a violent and external injury (operation) might itself

be accidental in that such effect was not intended and could, if such results were known to be capable of being so caused, be avoided. Certainly as before stated there is nothing in the provision of the policy here under discussion which requires it to be applied to the first cause in the chain of untoward events. If one of the links in the chain of causation itself is a violent, external and accidental cause of the links which succeed it, the provision of the policy in that respect has been met.

We have largely rested the decision of this case on our own Whatcott case and that line of cases which hold as it did. Independently of that case there is, as has been heretofore intimated, substantial authority for the proposition that whether the means are accidental is determined by the character of their effects.

*"Accidental means are those which produce effects which are not their natural and probable consequences.* The natural consequence of means used is that consequence which ordinarily follows from its use, the result which may be reasonably anticipated from its use—and which ought to be expected. The probable consequence of the use of a given means is the consequence which is more likely to follow from its use than it is to fail to follow."* (Italics part of quotation.) Vol. 6, Cooley's Briefs on Insurance, 2d Ed., p. 5234.

In one sense every effect following from a cause operating under the conditions under which it did operate is the natural result of that cause. Given that particular set of conditions the result was inevitable and natural in the sense that according to the laws of nature and of physics, absent something supernatural, such could only be the result. But the term natural is not used in that respect. Its meaning is as above stated. Hence, appellant's contention that the result of this operation was a natural and even forseeable, although comparatively infrequent result and therefore not accidental, is not sound. It is argued that such holding as in the Whatcott case opens up the question as to whether any and every unexpected result of a technically correct operation is not an accident. Perhaps so, but we need now go no further than to say that where it clearly appears

from the evidence that the operation set in motion definite particles of matter distinctly and directly traceable to the operation without which the probability is that they would not have been generated or set in motion and it specifically appears that the action of that substance on a vital organ caused the death of the patient, such death was directly caused by an injury effected by violent, external and accidental means.

This holding as to the questions raised by the first cause of action makes it unnecessary to consider the errors assigned relating to the second cause of action.

Judgment affirmed. Costs to the respondent.

McDONOUGH, and WADE, JJ., concur.

LARSON, J., dissents.

MOFFAT, J., participated in the hearing but was, before the publication of the opinion, deceased.