## KELLOG v. CALIFORNIA WESTERN STATES LIFE INS. CO.

No. 7159.   Decided January 28, 1949.   (201 P. 2d 949.)

See 45 C. J. S., Insurance, sec. 938; 29 Am. Jur. 706. Compliance with requirements of insurance policy as to proof of death by accident, note, 170 A. L. R. 1263.

*Pugsley, Hayes & Rampton,* of Salt Lake City, for appellant.

*Ray, Quinney & Nebeker,* of Salt Lake City, for respondent.

PRATT, Chief Justice.

In this action, plaintiff, as widow of the deceased seeks to recover double indemnity under the terms of an insurance policy issued upon the life of the deceased, the latter having died as the result of post-operative surgical shock. The appropriate phrases of the policy read as follows:

"Upon receipt of due proof  *  *  *  that the death of the insured occurred  *  *  *  as the result of  *  *  *  bodily injury,  *  *  * which is effected *exclusively and wholly,* by external, violent and accidental means, of which there is a visible contusion or wound on the body  *  *  *  and that such death occurred within ninety days after sustaining such injury, the Company, subject to the limitations hereinafter set forth, will pay double the face amount of the policy, or Four Thousand Dollars, instead of the face amount of the policy." (Italics added.)

"Risks Not Covered—This benefit shall not be payable if the death of the insured results directly or indirectly, from  *  *  *  physical or mental infirmity;  *  *  *  illness or disease of any kind;  *  *  *."

The lower court took the view that the death was the result of physical infirmity or illness or disease and did not find that it resulted from accidental means within the quoted terms. There are two assignments of error, one attacking the failure to find accidental means; the other attacking the finding pertaining to physical infirmity or illness or disease.

The only testimony in the case is that of two doctors, witnesses on behalf of the plaintiff, one of whom testified by deposition.

The nature and development of post-operative shock was described as follows:

"Post-operative shock usually results from severe trauma on the sympathetic nervous system of the body, also loss of blood, loss of bodily fluids in the way of perspiration. Those are probably the main causes of the post-operative shock. Did you mean what goes on from then on?

\* \* \* \* \*

"The person develops, usually, the symptoms of restlessness, increasing speed and weakness of the pulse, gradual lowering of the blood pressure, probably mental restlessness, increasing, maybe to coma, profuse perspiration, as a rule, extreme weakness, probably cyanosis or bluing of the tissues, or extreme paleness. Those are the usual symptoms of increasing surgical or traumatic shock.

\* \* \* \* \*

(in discussing ventricle fibrillation)

"That probably was terminal, if it happened in this case. That is the testimony. I can say I would not think that it would be the usual thing. Shock generally is the result of gradual anemia or anoxemia of the brain due to circulatory failure. The brain loses its blood supply, and the person becomes comatose. They usually die from circulatory failure, especially, hitting the brain. That is my understanding of it."

The deceased was operated upon twice—once in 1944, and once in 1945. The first was for a perforated duodenal ulcer, and he had an abnormal appendix which was also removed. Immediately after the operation he became critical and suffered shock, or became cyanotic. The second was for post-operative ventral hernia, which apparently

developed from the first operation. Deceased was a chunky type, muscular individual about five feet ten inches in height, weighing some 230 pounds, with a very large chest and a very highly developed muscle girdle and short neck— described as bull-necked. He was 46 years of age. He wore an abdominal support which caused him discomfort. Before the second operation he was completely examined to ascertain if his physical condition was safe for an operation of that nature. The examination was complete, including blood tests, X-rays, metabolism tests, and he was found to be fit. The hospital and procedure were standard. But, in attempting to make an incision from the lower border of the ribs to well below the naval it was found that the intestines had adhered to the anterior wall, and there were adhesions between the protruding bulge of intestines and the next layers. There were seventeen difficult and critical adhesions to be overcome, which required considerable time and great care. If not remedied they would stop the bowel passages. The operation took six hours. There was a great deal of loss of blood and body fluid. No mishaps occurred. When the operation was finished there was no evidence of shock or unusual reaction. The patient left the operating table at 5:00 P. M. and his condition showed good until about 1:30 A. M. The nurse then called stating that his breathing was not good, and she thought he was quite cyanosed. After 1:30 there was no other reported change. At 10:30 A. M. the next day he was in shock and unconscious. At 1:05 P. M. he died, still in shock.

Upon these facts as a foundation, the testimony of the two doctors was centered upon the anticipatory character of death from post-operative surgical shock. Generally speaking the testimony was to the effect that it might occur in any operation, although it is not ordinarily expected. It is, however, considered as a possibility in any operation —the more extended the operation, the greater the likelihood. The doctor who performed the operation spoke of

the deceased as a poor surgical risk, when the adhesions were found. The other doctor in answer to a hypothetical question covering these facts spoke of them as making a rather bad prognosis.

We shall now examine the law.

It should be kept in mind, that in review of the decision of the lower court, we do not make an effort to decide the factual issues as if we were the trial judge. We look only to see if his conclusions are sustained by competent evidence.

The most recent case we have is *Tucker* v. *New York Life Ins. Co.*, 107 Utah 478, 155 P. 2d 173. It holds that where the disease co-operates with the accident in causing death, the accident cannot be considered the sole cause of death. The death there was due to the weakened condition of the deceased's aorta arising out of high blood pressure, which weakness could not withstand the shock of a fractured arm, and aorta lining gave way under the increased blood pressure.

In the present case the evidence shows that the deceased suffered shock after the first operation, which was a less complicated operation. In the second operation it was discovered deceased's condition was such that the operation was going to be long and hard. It is true, of course, that his loss of the energy or ability to withstand shock is not evidenced by some physical object like the weakened aorta in the Tucker case, but it can be ascertained by comparison between operations. If the first or lesser operation was productive of shock, it is very likely that the second or greater operation will magnify that shock accordingly. There is no escaping the conclusion that there is a disclosed connection between such a physical disability as weakened his resitance to shock and that shock, even though the disability is not capable of physical identification.

The case of *Handley* v. *Mutual Life Ins. Co.*, 106 Utah 184, 147 P. 2d 319, 152 A. L. R. 1278 gives us a good dis-

cussion of the authorities upon the accidental nature of death. That case decides that if death is an unexpected result of an intended act it is to be considered accidental. The deceased in that case was a man of 53 years of age, in normal and good health who underwent an operation for the reduction of hernia. The hernia had been caused by the falling of a steel bar which hit him in the groin. He died of pulmonary embolism. In other words, from causes unknown, little clots of blood developed behind the operative site, passed along his blood stream and lodged in his lung where it blocked passages and caused the blood to pour into the air sacs. These facts were held to have proven an accidental death. The terms of the policy were very similar to those of this case as well as the Tucker case. It was the contention of the defense in the Handley case that the death was not accidental as it was neither unnatural nor unforseeable. We held, however, that the test was that of unexpectedness.

It would seem that if death was an unexpected result of an operation the efficient cause and effect relationship is not between the intended act—the operation—and the death, but between death and some other intervening cause. In the Handley case such an independent cause was capable of physical ascertainment—the blood clots. The cause for them was unknown, but they were not considered as anything necessarily inherent in the nature of the operation. A failure to link them as necessarily inherent in the operation justified the determination that they were accidental —that they were the independent link in the general chain of causation which was violent, external and accidental.

May the present Kellogg case be set up in a comparable way?

The doctor's description of the nature and development of post-operative shock (see above) indicates clearly that it is a progressive thing, becoming more and more dangerous with that progression. The layman knows, without

expert testimony, that shock of some degree is attendant upon any substantial operation, and this is confirmed by the medical testimony in the present case. The question thus resolves itself to one of whether or not the accidental character of the death should be measured by the susceptibility of the injured person to the dangerous degree of shock—the shock from which death may result or has resulted. In other words, if Mr. Jones is an individual whose sympathetic nervous system is sensitive to pain and physical reactions, is post-operative shock as to him non-accidental because it is to be anticipated? On the other hand, as to Mr. Smith, is it accidental because his sympathetic nervous system is phlegmatic and not easily upset? It is hard to escape such conclusions knowing as we do that the anticipatory nature of the result may not be the same in all cases. We are not, of course, justified in laying down an inflexible principle that death from post-operative shock can never be accidental death.

It is fair to say that in cases where intervening causes between an operation and death are impossible of segregation and definite identification, the question of accident lies in the question of the anticipatory nature of the results, which in turn should be measured by the susceptibility of the deceased to such results. If the history of the deceased's health and physical condition before and at the time of the operation are such that an operation of standard requirements for the care of that ailment would not, in the average individual with similar physical ailments and condition, have produced a fatality, then the death is accidental. Specifically applied here: Deceased's previous experiences with shock from a lesser operation coupled with his physical condition, including that disclosed upon the initiation of the second operation, viewed in the light of the nature and the length of time required to accomplish this second operation, are all facts which support the belief that death was not accidental. Post-operative shock to a dangerous degree was very likely to him. He was a poor

risk, as one doctor indicated. His history made a bad prognosis, said the other.

These principles we have discussed are illustrated in the case of *Cooper* v. *New York Life Ins. Co.*, 1947, 198 Okl. 611, 180 P. 2d 654. In that case a patient died from poisoning, the result of the injection of morphine sulphate, a recognized method of treatment. The case discloses no history of any abnormality in the deceased. The result was extraordinary and unanticipated. It was held accidental. Suppose, however, evidence had been produced that previously in the course of an operation deceased had reacted violently to such an injection, although he did not pass away. Would that make a difference in solving the question of accident? Certainly the rule of unexpectedness must be governed by the facts evidencing a susceptibility of the victim to the attendant results. Each individual may be considered the average individual unless the facts disclose that in reality he is not; and when the facts do so show, then the question of the accidental nature of the result must be measured by this knowledge. See also *Whatcott* v. *Continental Casualty Co.*, 85 Utah 406, 39 P. 2d 733. If a deceased is in a physical condition which has reduced his resistance, it stands to reason that he is not going to withstand an operation as well as the normal man. If, in addition to that strain he is susceptible to shock, it seems almost conclusive that serious results may be likely. To speak of his death as accidental under such circumstances is to say that such death is always accidental, as there would be no measure for dividing it into two classes of accidental and non-accidental.

We are of the opinion that there is evidence to support the lower court's findings, and to justify his refusal to classify the death as accidental.

Judgment affirmed.

WADE, Justice (concurring).

I concur. Here, by its decision, the trial court on conflicting evidence found as a fact that the shock was not suffi-

ciently unexpected to constitute an accident. The evidence was sufficient to support such a finding and probably was sufficient to support a contrary finding.

As pointed out by Mr. Justice Wolfe this case is distinguishable on its facts from *Handley* v. *Mutual Life Ins. Co.*, 106 Utah 184, 147 P. 2d 319, 152 A. L. R. 1278, where death was caused by a blood clot which formed unexpectedly behind the site of the operation. In that case the degree of unexpectedness was much greater than here. There also was a definite unexpected physical change, i. e., the forming of the blood clot, which in turn clogged the blood passage and caused death. Thus, we have an injury (the clogging of the blood passage) caused by accident (the unexpected forming of the blood clot). Here there was no known unexpected physical change which caused death. The unexpected event was the fact that the man died. Shock is more in the nature of a disease or of complete physical exhaustion or debilitation. In this case it probably cannot be said, strictly speaking, that we have death by accident. If an accident at all, it would be more in the nature of an accidental death. However, the Handley case was probably decided on the theory that it was an accidental death, not death by accident.

While the Handley case can be distinguished from this case on the ground that there an unexpected, distinct physical change preceded and caused the injury and death, and that here the shock which caused it is more in the nature of a disease, symptomatized by complete exhaustion and debilitation, the case of *Richards* v. *Standard Accident Ins. Co.*, 58 Utah 622, 200 P. 1017, 17 A. L. R. 1183, is not so distinguishable. In that case Richards, who carried an insurance policy with a clause similar to the one here involved, died from sunstroke. In the opinion affirming a judgment on that policy in favor of his beneficiary we conceded that medical science as well as many courts classified sunstroke as a disease, and that there was no known unexpected change which in turn caused the death. We, how-

ever, held that the ordinary person in buying such a policy would consider, if he were killed by a sunstroke it would be as much an accident as if he were struck by lightning, and that he would not make the fine distinction between accidental death and death by accidental means and therefore the policy should be construed to mean what such person would think it meant.

The fact that a person is injured or killed by a disease does not necessarily preclude an accidental cause. This court has repeatedly recognized this in Workmen's Compensation cases. See *Andreason* v. *Industrial Commission*, 98 Utah 551, 100 P. 2d 202; *Henderson* v. *Industrial Commission*, 80 Utah 316, 15 P. 2d 302.

WOLFE, Justice (concurring in the result.)

I concur in the result. I am not so sure that I have fathomed the meaning of some of the statements in the prevailing opinion. I shall state briefly my own grounds for concurring in the result.

Post-operative shock in some degree is always to be expected, but death from the operation is not ordinarily to be anticipated. The fact that death unexpectedly ensues from shock, itself due to an operation, does not make that death accidental.

In the case of *Handley* v. *Mutual Life Ins. Co.*, 106 Utah 184, 147 P. 2d 319, 152 A. L. R. 1278, we had the surgical operation at one end of a chain and death at the other. The operation furnished the violent and external force. This caused and/or set in motion certain small particles of matter in the blood stream. This particle or particles floating in the blood stream reached the lungs and blocked the passage of blood therein. This caused the blood to pour into the air sacs causing death. This pathological chain was well known to the medical profession. And as Mr. Chief Justice Pratt suggests, the death was traceable back to blood clots which developed unexpectedly behind the site

of the operation and which therefore themselves were the accidental means starting the internal chain which led to death.

In the instant case, post-operative shock was expected. It was a concomitant of the operation. But in this patient it was not expected to the degree which would cause death. And the pathological cause of the phenomena which caused the shock and consequent death is not physically traceable as in the Handley case. Evidently the patient suffered extreme debilitation—a loss of vitality to a point where the spark of life was altogether extinguished—death occurred by a process more in the nature of a disease than an accident as such term is thought of by the average intelligent layman. If death were due to post-operative pneumonia, for instance—I doubt that we would hold it to be an accident despite the fact that it was unexpected. While the line is a fine one and perhaps not logical—the law not being logic—there is a practical difference between those cases on the one hand where the unexpected course of the series of successive cause and effect relationships stemming from the operation down to the death are each definite and certain in character and, on the other hand, where the series runs into a disease or debilitation which itself is the immediate cause of death. At bottom, this distinction may rest on the relative sharpness of the successive pathological phenomena lying between the operation and its ultimate consequence—death. In one case each event and its known result in the series is local and definite. In cases like the instant case, shock is expected but not to such extent as to overcome all vitality, and the pathological nature more comparable in its generality to the ravages of a disease.

LATIMER and McDONOUGH, JJ., concur in the opinion of WOLFE, J.