**Carol HOFFMAN, Plaintiff and Appellant,**

v.

**LIFE INSURANCE COMPANY OF NORTH AMERICA, Defendant and Respondent.**

**No. 18184.**

Supreme Court of Utah.

Aug. 5, 1983.

---

3. *See Beth W. Corp. v. United States,* 350 F.Supp. 1190 (S.D.Fla.1972); *Imel v. United* States, 523 F.2d 853 (10th Cir.1975).

M. David Eckersley, Salt Lake City, for plaintiff and appellant.

H. James Clegg, Henry K. Chai, II, Salt Lake City, for defendant and respondent.

STEWART, Justice:

This is an action to recover on an accidental death insurance policy. The trial court denied recovery, ruling that the decedent's death was not an accident. We reverse and remand.

I.

On February 5, 1979, the decedent, Louis Hoffman, was shot and killed by Salt Lake City police officers. At the time of his death, Mr. Hoffman was insured against accidental death and dismemberment under a policy issued by the respondent, Life Insurance Company of North America (Company). The policy insured Mr. Hoffman "against loss resulting directly and independently of all other causes from bodily injuries caused by accident . . . ." The decedent's wife, appellant Carol Hoffman, is the beneficiary under the policy. After Mr. Hoffman's death, Mrs. Hoffman filed a claim which the Company denied. She then brought this action.

In the weeks preceding his death, Mr. Hoffman was suffering from acute and chronic paranoia as diagnosed by Dr. Robert Mohr, a psychiatrist. Dr. Mohr began seeing Hoffman on January 29, 1979, one week prior to Hoffman's death when Hoffman took eighteen dalmane tablets and drove himself to Holy Cross Hospital emergency room. Dr. Mohr held a counseling session that evening and held at least three more sessions with Hoffman prior to his death, including one session the day of his death.

Dr. Mohr diagnosed Hoffman to be both suicidal and homicidal. During some of the therapy sessions, Dr. Mohr had a third person present because he feared for his own safety. He felt that hospitalization was needed as he considered Hoffman to be a danger to himself and others, but Hoffman refused. Dr. Mohr testified that Hoffman was profoundly delusional, probably in all areas of his thinking. Hoffman's primary delusion was that his wife was having an affair with her boss, and he continually insisted that Dr. Mohr administer "truth serum" to her so that he could discover the truth of the matter.

Dr. Mohr thought that Hoffman's acute paranoia had been brought on by a number of recent traumatic events. Hoffman's father, to whom he was very close, had recently died. Because he had been unhappy with his job, Hoffman had quit. In

addition, Mrs. Hoffman had conveyed to him her desire to obtain a divorce.

The counseling sessions were not the first contact Dr. Mohr had had with Hoffman. Hoffman was a proficient duck and goose hunter, and he designed and built airboats. Dr. Mohr had hunted with Hoffman on several occasions and had bought an airboat from him. Mohr testified that during that part of their acquaintance, there was nothing to indicate that Hoffman was violent or potentially violent.

Hoffman's family and a close friend had noted the change in Hoffman's mental state in the weeks preceding his death. His family became particularly concerned about another possible suicide attempt after he took the dalmane tablets. In the week following that incident, Hoffman made several references concerning suicide to his family and to·Dr. Mohr.

On the day of Hoffman's death, Mrs. Hoffman arrived home at approximately 5:30 p.m. and told Hoffman that she had seen a lawyer that day concerning a divorce. Hoffman became upset and drank approximately one-half to three-quarters of a fifth of whiskey. He then went downstairs and obtained a .357 magnum belonging to his son. He took the pistol upstairs and ran out of the house. Mrs. Hoffman called the police. When Mr. Hoffman went around to the back of the house, Mrs. Hoffman ran out of the house to a neighbor's. Mr. Hoffman fired the pistol while he was in the yard and then left the house in his jeep.

Officer Lorraine Killpack responded to the scene. While she was talking to Mrs. Hoffman, who had returned to the residence, and Karee Hoffman, the Hoffman's twenty-two year old daughter, Mr. Hoffman called and talked to Karee. He told her that he was at the airport and asked her to meet him there. Officer Killpack advised her not to go as she feared it was a ploy to get Karee out of the house. A few minutes after Hoffman hung up, his mother called to tell them that Hoffman had just left her house and was on his way home.

Mrs. Hoffman and Karee went to a friend's house.

Officer Killpack drove down the street and parked, waiting for Hoffman to arrive. When he drove by, she pulled in behind him. Two other officers, Frank Hatton-Ward and Gilbert Salazar soon joined her. The officers turned on their lights and sirens in an attempt to get Hoffman to pull over. Instead, he entered the I–80 freeway. He then exited the freeway and took a circuitous route back to the Hoffman residence where he pulled into the driveway.

The three officers pulled up in front of the residence. Hatton-Ward approached Hoffman's vehicle from the right rear side, with Salazar a couple of steps behind him. The two officers both went to the right passenger window of the jeep, and Hatton-Ward shouted at Hoffman to freeze and drop the gun. Meanwhile, Killpack had approached from the left rear and had stationed herself at the left rear corner of the jeep. She ordered Hoffman to get out of the car with his hands up.

At this point, the testimony of the officers is divergent. Hatton-Ward testified that when he reached the right passenger window, Hoffman had the gun in front of him between his body and the steering wheel. Hatton-Ward leaned through the window, pointed his weapon at Hoffman, and told him to put down his gun or he would have to shoot. The driver's door was open, and Hoffman started to get out. As he got out, Hoffman's gun, held in his right hand, pointed down the driveway toward the street. As Hoffman rotated to his left to exit the vehicle, still holding the gun in front of him, the gun passed out of Hatton-Ward's line of sight. At that time, Hatton-Ward shot Hoffman four times in the back and left side.

Officer Salazar testified that when he reached the passenger window, Hoffman had the gun in front of his body, pointed straight up. After looking to his left and then his right, Hoffman quickly brought the gun down and pointed it in the direction of Hatton-Ward and Salazar. Salazar fired three shots. According to Salazar, Hatton-

Ward had already fired one or two shots when Salazar began firing. Salazar testified that he did not see Hoffman open the driver's door or attempt to exit the vehicle.

Officer Killpack testified that after she had positioned herself at the left rear corner of the vehicle, Hoffman opened the door and stepped out. As he exited, his body was rotating to his left and his right hand was shoulder high to clear the steering wheel. He rotated until his body was at about a 45° angle from facing Killpack. The gun was pointed at the ground. Her testimony was that at that point, he was shot by Salazar and Hatton-Ward.

Dr. Mohr testified that on the day of his death, Hoffman "was psychotic and at that time not able to make sound rational judgments." Dr. Mohr felt that "because of the highly unstable nature of his whole emotional state at that time, any unexpected, intense, or threatening incident would have caused a reaction of unreasonable magnitude, an unpredictable reaction." In Dr. Mohr's opinion, that reaction was a product of Hoffman's mental illness.

Carol Hoffman argues that her husband's death was an accident. She does not propose any standard by which this Court is to determine when a death is accidental; she argues only that the test should not be whether the death was reasonably foreseeable by the insured. She also argues that even if Hoffman's death was reasonably foreseeable, his mental illness precluded him from making rational decisions about his conduct or prevented him from controlling his behavior in light of probable consequences. Therefore, she contends, application of an objective "reasonable foreseeability" test is inappropriate. She concludes that due to his mental illness, Hoffman could not subjectively foresee that his actions would result in his death because of the acts of others, or that even if he could foresee that result, he was unable to control his conduct. In either event, his death was

accidental within the meaning of language of the policy.

■ The Company argues that Hoffman's death was not an accident because it was reasonably foreseeable. The Company argues that an objective test should be applied without regard to Hoffman's mental illness since every person is held to intend the natural and probable consequences of his actions. The Company argues that even if Hoffman's mental illness should be taken into account, the trial court made no finding that Hoffman's mental health prevented him from understanding the consequences of his actions or caused him to behave as he did. Therefore, it must be concluded that the claimed mental illness did not prevent him from understanding the consequences of his actions nor did it cause him to behave as he did.[1]

The trial court, without defining the term "accidental" or making findings on Hoffman's mental condition, held the death nonaccidental.

## II.

■ In *Richards v. Standard Accident Insurance Co.,* 58 Utah 622, 200 P. 1017 (1921), this Court first laid down the standard for defining the words "accident or "accidental" as used in an accidental death insurance policy.

*The word is descriptive of means which produce effects which are not their natural and probable consequences. . . .* An effect which is the natural and probable consequence of an act or course of action is not an accident, nor is it produced by accidental means. It is either the result of actual design, or it falls under the maxim that every man must be held to intend the natural and probable consequence of his deeds. [Emphasis added.]

*Id.* at 636, 200 P. at 1023 (quoting *Western Commercial Travelers' Association v. Smith,*

---

1. At trial, the company asserted that Hoffman's conduct amounted to suicide and therefore falls within the suicide exclusion in the policy. The Company has not pressed that claim on appeal, and accordingly, we do not decide the issue. However, we note that even though there was evidence that indicated that Hoffman was suicidal, the Company did not establish that Hoffman actually intended to take his own life.

85 F. 401, 405 (8th Cir.1898)). In *Richards* the Court also defined the phrase "natural and probable consequence," stating:

> The natural consequence of means used [is] the consequence which ordinarily follows from their use—the result which may be reasonably anticipated from their use, and which ought to be expected. The probable consequence of the use of given means is the consequence which is more likely to follow from their use than it is to fail to follow.

*Id.* Thus, a person is a victim of an accident when, from the victim's point of view, the occurrence causing the injury or death is not a *natural and probable* result of the victim's own acts.

The standard stated in *Richards* has been applied consistently by this Court. *See Thompson v. American Casualty Co.,* 20 Utah 2d 418, 439 P.2d 276 (1968); *Kellogg v. California Western States Life Insurance Co.,* 114 Utah 567, 201 P.2d 949 (1949); *Handley v. Mutual Life Insurance Co.,* 106 Utah 184, 192, 147 P.2d 319, 322 (1944); *Sanders v. Metropolitan Life Insurance Co.,* 104 Utah 75, 83, 138 P.2d 239, 242–43 (1943); *Whatcott v. Continental Casualty Co.,* 85 Utah 406, 39 P.2d 733 (1935); *Billings v. Continental Life Insurance Co.,* 81 Utah 572, 577–78, 21 P.2d 103, 105 (1933).

■ These cases, however, are somewhat confusing in their use of terms such as "unforeseen," *e.g., Handley, supra,* 106 Utah at 190, 147 P.2d at 322, and "[not] reasonably anticipated," *e.g., Richards, supra,* 58 Utah at 636, 200 P. at 1023, in describing what constitutes an accident. Those terms seemingly imply that if the insured negligently causes his or her own death, it is not an accident. That position, however, was rejected in *Richards, supra,* which held that unless the policy otherwise provides, the negligence of the insured could not be raised as a defense by the insurer. As this Court stated in *Kellogg, supra,* 114 Utah at 572, 201 P.2d at 952, the test is not whether the result was foreseea-

ble, but whether it was expected. *See also Schmidt v. Industrial Commission,* Utah, 617 P.2d 693 (1980) (Wilkins, J., concurring) ("accident" is "an unlooked for mishap which is not expected or designed"). Other courts which have addressed the issue are in accord with *Richards.*[2] *See* 43 Am.Jur.2d *Insurance* § 557 (1982).

■ The doctrine of foreseeability is used in tort law to establish the scope of the duty of a person to exercise reasonable care to avoid harming others. In insurance law, however, the issue is one of contractual meaning, i.e., what is the nature of the risk described by the term "accident" or "accidental" that the insurance company insures against. In construing such contractual provisions, our point of view is "that of the average man." *Id.* 106 Utah at 190, 147 P.2d at 322 (*quoting Lewis v. Ocean Accident & Guarantee Corp.,* 224 N.Y. 18, 21, 120 N.E. 56, 57 (1918)). Accident insurance policies "are purchased with the understanding that if death results from an unintended or an intended cause where it was not the expected but the supposedly improbable result[, the death is] covered by the policy." *Handley, supra,* 106 Utah at 190, 147 P.2d at 322. The layman views an accident as any result which is not expected. *See Kellogg,* 114 Utah at 572, 201 P.2d at 951–52 (discussing *Handley*). Webster states that "EXPECT usually implies a high degree of certainty . . ." and defines the term as "to consider probable or certain . . . ." *Webster's Third International Dictionary* (1976).

■ Thus, since the common meaning of the term is defined in terms of whether the event was naturally and probably expected or anticipated by the insured, *see Freeman v. Commonwealth Life Insurance Co.,* 149 Ind.App. 211, 271 N.E.2d 177 (1971), *aff'd,* 259 Ind. 237, 286 N.E.2d 396 (1972), it is that definition which must be applied, and not one founded on foreseeability.

---

**2.** In the analogous area of liability insurance, courts have generally held that "accident" includes results negligently caused by the in-

sured. *See* 43 Am.Jur.2d *Insurance* § 710 (1982); Annot., 7 A.L.R.3d 1262 (1966).

■ That construction is consistent with the rule that contract language should "be construed against the party who drew it and especially is this so in the case of contracts which are sold widely to the average man." *Handley, supra,* 106 Utah at 191, 147 P.2d at 322.

■ The "unexpected event" standard laid down in *Richards* as to what constitutes an accident includes not only death resulting from conduct of the insured which is negligent, but also death resulting from an insured's conduct which is reckless.[3] Thus, in *Sanders v. Metropolitan Life Insurance Co.,* 104 Utah 75, 138 P.2d 239 (1943), recovery was allowed where the insured died while attempting to elude a police officer in a high speed chase. The insured and a companion had escaped from the State Industrial School, stolen an automobile, and when spotted by a police officer, attempted to elude the officer. The car left the road, rolled over, and both the insured and his companion were killed.

However, where the insured expected or anticipated that death would follow from his or her conduct, recovery has been denied. Thus in *Kellogg, supra,* recovery was denied where the insured died of post-operative shock where the insured had previously suffered severe post-operative shock following a less serious operation. Chief Justice Pratt, writing for the court, noted that the insured knew of his own medical history and that he was in poor physical condition. The doctor who performed the surgery had felt that the insured was a poor surgical risk. Under the circumstances, "[p]ost-operative shock to a dangerous degree was very likely." 114 Utah at 573, 201 P.2d at 952. Since the insured knew this, the death was held not to be accidental.[4]

While the cases from other jurisdictions, as well as from Utah, often suffer from the same degree of ambiguity because of the inherent difficulty of the problem, an examination of those cases indicates that the *Richards* test is essentially the test applied by other jurisdictions. *See* Annot., 49 A.L.R.3d 673 (1973); Annot., 26 A.L.R.2d 399 (1952).

### III.

■ We turn now to the facts of case before us. Numerous cases have decided the question whether an armed insured who is shot to death by another is accidental. *See generally* Annot., 49 A.L.R.3d 673 (1973); Annot., 26 A.L.R.2d 399 (1952). The general rule to be gleaned from the cases is that if the insured threatens to kill, or inflict serious bodily injury on, another person or assaults another person under circumstances making it likely the other person will respond with deadly force, and does so and kills the insured, the insured's death is not accidental.

■ On the other hand, the simple fact that an insured is armed during a confrontation does not, by itself, make the insured's death nonaccidental. *Republic National Life Insurance Co. v. Heyward,* Tex.Civ. App., 568 S.W.2d 879 (1978); *Nelson v. American National Insurance Co.,* 67 Ga. App. 775, 21 S.E.2d 658 (1942), *aff'd after remand,* 69 Ga.App. 537, 26 S.E.2d 203 (1943); *Lothrop v. Travelers' Insurance Co.,* 167 Minn. 340, 209 N.W. 20 (1926); *Employers' Indemnity Corp. v. Grant,* 271 F. 136 (6th Cir.1921); *Metropolitan Casualty Insurance Co. v. Chambers,* 136 Ark. 84, 206 S.W. 64 (1918). Where the insured has not used the weapon to threaten death or serious bodily injury to his killer, the insured's death has been held accidental. For exam-

**3.** Many cases have held that the term "accident" in liability insurance contracts includes results recklessly caused by the insured. *See* 43 Am.Jur.2d *Insurance* § 710 (1982); Annot., 20 A.L.R.3d 320 (1968).

**4.** It should be noted that only two justices concurred in that reasoning. The three remaining justices felt that the probability of death

was not sufficiently high to consider the death as other than accidental. They concurred in the result, however, based on other grounds. They thought that the death was not due solely to a violent and external force, as required by the policy. While the surgery was a violent and external force, the poor health of the insured was not.

ple, in *Nelson v. American National Insurance Co., supra,* the ⟨insured went into a store looking for his brother whom he intended to kill. He held a loaded revolver by his side. The storekeeper, after trying to talk the insured into leaving, shot and killed the insured. Recovery on the insured's accidental death policy was allowed because the insured had made no assault on, or threats against, the storekeeper. And in *Lothrop v. Travelers' Insurance Co., supra,* the insured was protesting the search of his car. When the deputy told the insured that he would arrest the insured, the insured said, "No you won't," and reached into his pocket. A bystander struck the insured who died within minutes. A revolver was found in the insured's pocket. The court allowed recovery on the ground that the insured had not drawn the weapon and endangered the safety of others with it.

■ However, if the insured uses the weapon and specifically threatens death or serious bodily injury to another, and that conduct results in the death of the insured, the death is not accidental. *See Isoard v. Mutual Life Insurance Co.,* 22 F.2d 956 (8th Cir.1927). In *Isoard,* a case applying Utah law, the insured was suspicious of another man's interest in his wife. He confronted the man with his shotgun in hand. Angry words were exchanged and the insured lifted the shotgun to his shoulders. As he lifted the gun, the other man shot him. The court held that his death was not accidental because the encounter was brought on voluntarily by deceased.

■ Those cases are consistent with the general standard for determining when a death is accidental. Where the insured's conduct threatens death or serious bodily injury to another, the insured should expect or anticipate that the threatened individual will very likely respond with deadly force.

Under those circumstances the death is not considered accidental. However, where the insured has not threatened death or serious bodily injury to another person, it is not likely that the other person will respond with deadly force and the insured's death is considered accidental.

■ In the instant case, the trial court found that "Hoffman failed and refused to comply with the officers' lawful commands, and, instead, attempted to exit the vehicle from the driver's door." Based on that finding, the court concluded that "[t]he death of Louis Hoffman did not result from an 'accident' as that term is defined and understood at law." Clearly, the act of exiting the vehicle did not threaten the lives of the officers, particularly in light of Officer Killpack's testimony that she ordered him to exit the vehicle. The critical question with respect to this aspect of the law is whether the insured should have expected that the natural and probable result of his exiting the vehicle with the gun would be his being shot by the officers. In short, the finding of fact quoted above does not support the trial court's conclusion that Hoffman's death was not accidental.[5]

■ There was, however, conflicting evidence as to whether Hoffman did in fact specifically threaten the officers' lives by pointing his weapon at them. Since it is the province of the trial court to resolve such conflicts, the matter must be remanded to the trial court for a determination as to whether Hoffman did in fact directly threaten the lives of the officers.

## IV.

The trial court made no finding as to the mental condition of Mr. Hoffman even though a substantial portion of the trial was devoted to testimony concerning his

5. Plaintiff brought a wrongful death action against the officers which was dismissed on the ground that the officers were justified in shooting Hoffman. It should be noted, however, that justification for the officers' conduct is not determinative of whether the insured's death was accidental. The question presented by this case is not whether the officers, "acting under the fears of a reasonable man, would have been justified in the act of killing the insured; but [rather] what the insured as a reasonable man should have expected or foreseen as the probable result of his own act." *American Nat'l Ins. Co. v. Nelson,* 69 Ga.App. 537, 539, 26 S.E.2d 203, 205 (1943).

mental illness. Apparently, the trial court did not consider Hoffman's mental illness to be relevant to the determination of whether his death was accidental.

██ The law is firmly established that the mental disease or defect of the insured is a relevant consideration in determining whether an insured's death is accidental. *See Continental Casualty Co. v. Maguire,* 28 Colo.App. 173, 471 P.2d 636 (1970); *Kobylakiewicz v. Prudential Insurance Co.,* 115 N.J.L., 180 A. 491 (1935); *Williams v. Prudential Insurance Co.,* 271 Ill.App. 532 (1933); *Weber v. Interstate Business Men's Accident Ass'n,* 48 N.D. 307, 184 N.W. 97 (1921); *Howle v. Eminent Household of Columbian Woodmen,* 118 Ark. 226, 176 S.W. 313 (1915); *Woodmen of the World v. Dodd,* Tex.Civ.App., 134 S.W. 254 (1911); *Blackstone v. Standard Life & Accident Insurance Co.,* 74 Mich. 592, 42 N.W. 156 (1889); *Accident Insurance Co. v. Crandal,* 120 U.S. 527, 7 S.Ct. 685, 30 L.Ed. 740 (1887).

Thus, in *Kobylakiewicz, supra,* the insured, upon his release from a mental hospital, threatened to kill his family and indulged in "throwing things about." Pursuant to a complaint filed by the insured's wife, several police officers came to his home to arrest him for assault and battery, but he chased them off with a pickaxe. The officers fired teargas into the home and then reentered. The insured was shot as he attacked an officer. The court held that evidence bearing on the insured's mental condition was properly considered, and allowed recovery on the insured's accidental death policy. The court reasoned that since the insured did not understand the moral character or the general nature and consequences of his actions, his behavior was impelled by an insane impulse and his death was accidental.

A case which is even more closely in point is *Williams v. The Prudential Insurance Co. of America,* 271 Ill.App. 532 (1933). The insured for no apparent reason became violent and struck his wife and another. After he went to his bedroom and loaded a rifle, he was confronted by a policeman who had been called and who told the insured to put the gun down. When the insured threatened to kill "them all," arose, and put the rifle to his shoulder and pointed it at the policeman, the officer shot and killed the insured. The court stated that if the deceased consciously provoked or induced his death, the result would not be accidental. However, on evidence that the deceased insured was mentally deranged, the issue of whether the death was accidental was submitted to the trier of fact which found the death to be accidental.

██ We are persuaded by the logic of these cases. "Each individual may be considered the average individual unless the facts disclose that in reality he is not; and when the facts do so show, then the question of the accidental nature of the result must be measured by this knowledge." *Kellogg v. California Western States Life Insurance Co., supra,* 114 Utah at 574, 201 P.2d at 952. Since the reason for this rule is that the subjective state of mind of the insured cannot generally be known, the law presumes that the insured is a "reasonable person" or "average individual" and applies an objective test unless the evidence shows that the insured is not an "average individual." Therefore, when the actual state of mind of the insured can be established, the probability of death resulting from certain conduct should be judged in light of that state of mind.

██ Thus, if the insured actually knows that his or her death is more likely than not to occur, the death is not accidental. *See id.* But if the insured cannot subjectively expect his conduct will produce his death because of a mental disease or defect, the death is accidental. Accordingly, we hold that where the insured suffers from a mental disease or defect so that he is not likely to be able to appreciate the consequences of his conduct, or cannot control his conduct in light of the probable consequences, then the test is subjective, and death may be accidental even though a rational person in the same circumstances would have expected death to be the probable result of his conduct.

The Company argues that the mental illness of the insured should not be taken into account because every person is presumed to intend the natural and probable consequences of his or her actions. We do not agree. Although the law frequently employs the proposition that one intends the natural and probable results of his conduct in tort and criminal law, as well as other areas of the law, a rule based on that proposition is generally only a rule of evidence giving rise to an inference, not a conclusive presumption or a shift in the burden of proof. · *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). The purpose of such a rule in tort law is to allow an innocently injured plaintiff to recover against an insane tortfeasor. However, in accident insurance law, there are no plaintiffs who have suffered at the hands of an insane defendant. When an insurance company has contracted to cover losses from a certain risk, and the occurrence of that risk causes an injury which is insured against, liability under the policy cannot be avoided on the basis of a presumption contrary to the actual fact.

On the basis of the evidence in the instant case, the trial court could have found that Hoffman was suffering from a mental disease or defect that prevented him from appreciating the consequences of his conduct or controlling his conduct in light of the circumstances. Dr. Mohr testified that, at the time of his death, Hoffman was unable to appreciate the consequences of his actions, i.e., he was unable to make sound rational judgments; could not control his conduct in light of the consequences; and any unreasonable and unpredictable action by Hoffman under the circumstances was a product of his mental illness.

There was also testimony that Hoffman was delusional, suicidal, and homicidal, and was "a very sick man" who should have been hospitalized immediately. Hoffman's family and friends had noted a change in his mental state in the weeks preceding his death and were concerned about him. Hoffman took an overdose of dalmane one week before his death and made several suicidal references to his family and to Dr. Mohr in the week preceding his death.

Because Dr. Mohr testified that Hoffman probably did not suffer from any delusion that he was immune from bullets, the Company argues that this indicates that Hoffman could appreciate the consequences of his conduct and that he was able to control his conduct in light of the circumstances. The critical issue, however, is not whether Hoffman appreciated the danger of firearms, but whether Hoffman's mental illness was such that he did not expect or anticipate that his conduct would probably draw police fire. That Hoffman knew that a firearm can be deadly is not evidence that, in light of his mental state, he knew his conduct would probably draw police fire or, if so, whether he could alter his course of conduct in light of such a likelihood or probability.

As previously noted, Dr. Mohr's testimony that Hoffman could not appreciate the consequences of his conduct and that he could not control his conduct in light of those consequences, is undisputed. Whether the trial court chose to disbelieve that evidence, or thought it immaterial, does not appear in the findings of fact and conclusions of law.

The trial court made no finding as to Hoffman's mental state. If the court were of the view that the deceased's mental state was immaterial, that view was incorrect. Furthermore, the trial court concluded in its findings of fact and conclusions of law that Hoffman's death was not an "accident." However, that term is not defined in the conclusions of law, so it is impossible to know what legal standard was attributed to that term. Furthermore, as noted, no findings were made with respect to insanity under the subjective standard.

### V.

Where a trial court has based its ruling on a misunderstanding of the law, or might have done so, and a correct application would have produced a different result, the adversely affected party is entitled to have the matter adjudicated under correct

principles of law. *Reed v. Alvey,* Utah, 610 P.2d 1374 (1980). Accordingly, we remand to the trial court for further consideration of the record under both the objective and subjective standards for determining what is an accident.

Reversed and remanded. Costs to appellant.

HALL, C.J., and OAKS, HOWE and DURHAM, JJ., concur.