**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 26, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

THE CINCINNATI INSURANCE
COMPANY, an Ohio corporation,

      Plaintiff Counter Claim
      Defendant - Appellant/Cross-
      Appellee,

v.

AMSCO WINDOWS, a Utah
corporation,

      Defendant Counter Plaintiff -
      Appellee/Cross-Appellant,

and

ARROWOOD INDEMNITY
COMPANY, as successor to Royal
Indemnity Company and American &
Foreign Insurance Company, a
Delaware corporation,

      Defendant.

No. 13-4155 and 13-4159
(D.C. Nos. 2:10-CV-00542-BSJ)
(D. Utah)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, Chief Judge, **KELLY** and **BACHARACH**, Circuit Judges.

---

    [*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

Plaintiff-Appellant/Cross-Appellee Cincinnati Insurance Company

("Cincinnati") and Defendant-Appellee/Cross-Appellant AMSCO Windows

("AMSCO") appeal from the district court's order, on summary judgment, holding

that Cincinnati has a duty to defend AMSCO in litigation concerning its

manufactured windows and doors, but not in Nevada "Chapter 40" prelitigation

proceedings. Cincinnati Ins. Co. v. AMSCO Windows, 921 F. Supp. 2d 1226 (D.

Utah 2013). Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm.


Background

AMSCO manufactures windows for use in homes and sells its products to

wholesale distributors and dealers. AMSCO does not install its own window

products or hire contractors or subcontractors to do so on its behalf. The AMSCO

window products at issue here were sold by a window dealer, J&L Windows, Inc.

("J&L"), and installed in new homes constructed in Nevada. Various Nevada

homeowners subsequently brought actions against the contractors who built their

homes, alleging that defective window products and their improper installation

caused property damage. The contractors then asserted claims against J&L and

others, who in turn asserted claims against AMSCO.

Some of the homeowner claims arise under "Chapter 40," a Nevada statute

governing homeowner construction defect claims. Nev. Rev. Stat. §§ 40.600 to

40.695. Under Chapter 40, before a claimant may pursue a construction defect claim in judicial proceedings, he must give written notice to the contractor, stating in detail the alleged defects and the known nature and extent of the damage caused by such defects. Id. § 40.645. The claimant must then give the contractor a reasonable opportunity to inspect the home and repair any damage found. Id. § 40.647. The contractor must forward the homeowner's notice to each subcontractor or supplier "whom the contractor reasonably believes is responsible for a defect specified in the notice." Id. § 40.646. At the conclusion of the prelitigation process, any unresolved claims may proceed to Nevada state court. Many of the homeowner claims at issue have ripened into civil litigation.

From January 1, 2002 to January 1, 2007, AMSCO maintained insurance coverage from Cincinnati under a series of renewable Commercial General Liability policies ("the Policies").[1] The Policies provided that Cincinnati would:

> [P]ay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. . . . This insurance applies to "bodily injury" and "property damage" only if . . . [t]he "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory."

App. 234. Cincinnati also issued a series of umbrella policies to AMSCO, which were in effect from January 1, 2002 to January 1, 2007, with substantially similar

---

[1] Although certain of these policies contained slightly different language, the parties agree that the difference in language is immaterial for the purposes of this appeal. Aplt. Br. 5.

language.

AMSCO tendered its defense of the Nevada homeowners' claims to Cincinnati, but Cincinnati refused to defend AMSCO.[2] Instead, on June 10, 2010, Cincinnati sought a declaration from the district court that it had no duty to defend or indemnify AMSCO against the homeowner claims in Nevada because under Utah law, which governs the Policies, allegations of property damage caused by the natural results of faulty workmanship do not implicate a covered "occurrence." On June 14, 2011, AMSCO filed a motion for summary judgment, asserting that the homeowner claims indeed allege "occurrences" and seeking an order requiring Cincinnati to defend AMSCO and pay all legal fees AMSCO had already incurred. In the alternative, AMSCO requested an order certifying to the Utah Supreme Court the question whether the homeowner claims require Cincinnati to defend AMSCO. On October 11, 2011, Cincinnati filed its opposition to AMSCO's motion and a cross-motion for summary judgment.

On February 5, 2013, the district court ruled that Cincinnati's duty to defend under the Policies extended to the homeowner claims in active litigation because, "where defective workmanship causes damage to property other than the

_____

[2] From 1998 through 2002, AMSCO purchased CGL coverage from another insurer, Arrowood Indemnity Company ("Arrowood"). Unlike Cincinnati, Arrowood assumed its obligation to defend AMSCO in connection with the Nevada homeowners' claims and subsequently sought equitable contribution or indemnity for its defense costs. Arrowood has not appealed from any of the district court's orders concerning its obligations.

work product itself . . . such damage results from an accidental 'occurrence' within the meaning of CGL policy language." Cincinnati Ins. Co., 921 F. Supp. 2d at 1260. However, the district court also held that Cincinnati's duty to defend does not extend to Chapter 40 prelitigation proceedings, which are not "suits." Id. at 1239–40. Cincinnati appeals from the former holding, and AMSCO appeals from the latter.

Discussion

We review an order granting or denying summary judgment de novo, applying the same legal standard used by the district court under Fed. R. Civ. P. 56(a). Holmes v. Colo. Coal. for Homeless Long Term Disability Plan, 762 F.3d 1195, 1199 (10th Cir. 2014). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If there is no genuine issue of material fact, then the reviewing court must determine if the district court correctly applied the law.

The parties agree that Utah law governs our interpretation of the Policies. Aplt. Br. 14–16; Aplee. Br. 35. Under Utah law, an insurer's duty to defend is broader than its duty to indemnify. Fire Ins. Exch. v. Estate of Therkelsen, 27 P.3d 555, 560 (Utah 2001). A duty to defend arises when the allegations underlying a third party's complaint against the insured, if proven, could result in

liability under the applicable insurance policy. <u>Nova Cas. Co. v. Able Constr., Inc.</u>, 983 P.2d 575, 578 (Utah 1999) (citing <u>Sharon Steel Corp. v. Aetna Cas. & Sur. Co.</u>, 931 P.2d 127, 133 (Utah 1997)). In determining whether liability could be triggered, an insurance policy must be construed in accordance with traditional rules of contract interpretation, affording terms their ordinary meaning in light of the policy as a whole. <u>Utah Farm Bureau Ins. Co. v. Crook</u>, 980 P.2d 685, 686 (Utah 1999). Where factual questions render coverage uncertain, an insurer must defend until those uncertainties are resolved against the insured. Further, all claims must be defended unless or until the suit involves only non-covered claims. <u>Benjamin v. Amica Mut. Ins. Co.</u>, 140 P.3d 1210, 1216 (Utah 2006). Although extrinsic evidence may at times be necessary to determine an insurer's duty to defend, the parties agree with the district court's conclusion that such evidence is not necessary here. <u>See</u> Aplt. Br. 18–19; Aplee. Br. 29; <u>see also</u> <u>Fire Ins. Exch.</u>, 27 P.3d at 561.

The claims against AMSCO at issue involve "window-related defects." The homeowners assert that windows manufactured by AMSCO were "defective and/or defectively installed" and that these defects "caused property damage to the interior and/or exterior of the house beyond the window defects themselves." <u>Cincinnati Ins. Co.</u>, 921 F. Supp. 2d at 1232. Essentially, the homeowners claim that "faulty workmanship involving AMSCO's windows caused property damage to something other than the insured's work product." <u>Id.</u>

Cincinnati's duty to defend AMSCO against these claims involves the meaning of two terms: "occurrence" and "suit." We agree with the district court that the homeowner claims allege "occurrences" as defined in the Policies, and that Chapter 40 proceedings do not constitute "suits." Thus, Cincinnati has a duty to defend AMSCO against the homeowner claims in active litigation but not against the homeowner claims in Chapter 40 prelitigation proceedings.

I.     The Nevada Homeowner Claims Allege "Occurrences" under the Policies

The Policies insure AMSCO against "property damage" caused by an "occurrence," which is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." App. 196, 206. Cincinnati makes a legal argument against finding a duty to defend: in claims involving manufacturing defects in windows and doors, there are no circumstances where any resultant damage to surrounding areas—such as the wallboard, paint, structure of the home or floorboards—could ever be deemed an "occurrence" under the Policies. Aplt. Br. 18. According to Cincinnati, such damage is not an accident; rather, it is a natural and probable result of faulty workmanship. Id.

A.     The Proper Standard is Expectation—Not Foreseeability

In N.M. ex rel. Caleb v. Daniel E., 175 P.3d 566 (Utah 2008), the Utah Supreme Court explained that the test for determining whether an event was an "occurrence" under a liability policy is not whether the result was "foreseeable,"

- 7 -

as the insurer argued, but rather whether it was "intended" or "expected." Id. at

571. The court carefully explained two limited situations where damage or injury

to property would be non-accidental and therefore not an occurrence under Utah

law:

> First, harm or damage is not accidental if it is the result of actual
> design or intended by the insured. Second, harm or damage is not
> accidental if it is the natural and probable consequence of the
> insured's act or should have been expected by the insured. The first
> category presents a factual question as to what the insured intended.
> The second category generally presents a legal question as to what
> the average individual would expect to happen under the
> circumstances.

Id. at 569–70. In making this pronouncement, the Utah Supreme Court indicated

that whether harm is a natural and probable consequence of certain conduct must

be determined from the perspective of the insured. Id. at 570. The court also

indicated that the focus of the inquiry should be on the resulting injury rather than

the actions of the tortfeasor. Id. Even if an act was intentional or negligent, as

we discuss below, the result may be unexpected or unanticipated. Id. at 571.

We find Cincinnati's broad argument inconsistent with these clear

principles. Cincinnati does not contend that AMSCO intended to cause property

damage. And nothing suggests that the damage at issue was expected—from

AMSCO's perspective—to result from its manufacturing process. The relevant

standard is not "what possibly could happen, but rather, what probably would

happen." Id. at 572.

- 8 -

Cincinnati's argument that water damage is a natural and probable result of the defective manufacture of windows, Aplt. Br. 11, 28–29, is essentially a foreseeability argument. Cincinnati asserts that it is foreseeable that a defective window or door could lead to damage in the surrounding structure; therefore, such damage is not an accident and not an occurrence. But this position is directly contrary to Utah precedent, which instructs that whether an event was accidental depends upon whether the result was intended or expected from the perspective of the insured. Nothing in the homeowner complaints, let alone the appendices, suggests that any surrounding property damage was an expected result of AMSCO's manufacturing process as a matter of law. Indeed, the available evidence is to the contrary. App. 187 ("[W]e do not intend nor do we expect to manufacture defective products.").

B.    Property Damage Arising from Negligence Can Be an "Occurrence"

None of the Utah or federal cases cited by Cincinnati, AMSCO, or the district court contradicts our analysis. Additionally, none of these cases persuades us to find, as Cincinnati argues, that an occurrence under Utah law can never result from negligent conduct. Aplt. Br. 21–23.

For example, in Hoffman v. Life Insurance Co. of North America, 669 P.2d 410 (Utah 1983), the Utah Supreme Court held, as in Caleb, that the test of what constitutes an "accident" is "not whether the result was foreseeable, but whether it was expected." Id. at 416. Further, the court in Hoffman explicitly recognized

that an accident can result from an insured's negligent conduct. Id. at 417 ("The 'unexpected event' standard laid down in Richards as to what constitutes an accident includes . . . death resulting from conduct of the insured which is negligent . . . .") (referring to Richards v. Standard Accident Ins. Co., 200 P. 1017 (Utah 1921)).

A later case cited by Cincinnati, Nova Casualty Co. v. Able Construction, Inc., 983 P.2d 575 (Utah 1999), reaffirms, rather than contradicts, Hoffman. There, the court held that damage resulting from negligent misrepresentation was not an "accident" or "occurrence" under a CGL policy. Id. at 580. However, the court recognized that negligence and negligent misrepresentation are distinct concepts. A manufacturer who negligently produces a defective window may not have expected his process to result in property damage. But, in Nova, a landowner who negligently misrepresented to a potential purchaser of real property that he could operate a business, when in fact restrictive covenants on the property prohibited those operations, both expected and intended the purchaser to rely on his statements. Id. Contrary to Cincinnati's suggestion, the Utah Supreme Court did not hold that an occurrence under a CGL policy can never result from ordinary negligence. Instead, the court distinguished and bolstered Hoffman, citing its holding that an accident can arise when an insured's negligent actions produce an unintended result—there, accidental death. Id.

Cincinnati argues, however, that several federal district court cases

applying Utah law hold that negligence cannot give rise to a covered occurrence. First, we note that we are not bound by prior federal district court opinions applying state law. Garcia v. Tyson Foods, Inc., 534 F.3d 1320, 1329 (10th Cir. 2008). Additionally, we discount the analysis in these opinions to the extent they elide the concepts of foreseeability and intent or expectation. Under Utah law, only the latter are relevant. H.E. Davis & Sons, Inc. v. N. Pac. Ins. Co., 248 F. Supp. 2d 1079, 1084 (D. Utah 2002) ("[R]egardless of plaintiff's negligence or the ultimate poor quality of its work, plaintiff could *foresee* the natural consequences of its actions." (emphasis added)); Great Am. Ins. Co. v. Woodside Homes Corp., 448 F. Supp. 2d 1275, 1280 (D. Utah 2006) ("[T]he court [in H.E. Davis] held that Utah law does not consider negligent work performed by an insured to be an occurrence because the consequences of negligent work are reasonably *foreseeable* and therefore no 'accident' resulting from that work can occur." (emphasis added)); Cincinnati Ins. Co. v. Linford Bros. Glass Co., No. 2:08–CV–387–TC, 2010 WL 520490, at *3 (D. Utah Feb. 9, 2010) ("Under Utah law, the consequences of negligent work are reasonably *foreseeable* and therefore no 'accident' resulting from that work can occur." (emphasis added) (citations omitted)).

Furthermore, any suggestion in the federal cases cited by Cincinnati that negligence can never give rise to an occurrence is the result of conflating claims of negligence resulting in damage to defective products and claims of negligence

resulting in damage to property <u>other</u> than the defective products themselves.  For

example, in <u>Employers Mutual Casualty Co. v. Bartile Roofs, Inc.</u>, 618 F.3d 1153

(10th Cir. 2010), we stated that "the natural results of an insured's negligent and

unworkmanlike construction do not constitute an occurrence triggering coverage

under a CGL policy."  <u>Id.</u> at 1174 (citations omitted).  However, the claims at

issue in <u>Bartile</u> arose out of construction defects caused by the insured's negligent

roofing work itself—not, as here, out of damage to property other than the

allegedly defective work.  Whether damaged property underlying a claim is the

direct product of negligent conduct or, instead, is one or more steps removed from

the alleged product of negligent conduct may determine whether an insured

expected that damage to result.  Thus, we do not believe that <u>Bartile</u> requires us to

hold—as a broad principle—that no occurrence can arise from negligence.[3]  The

Utah Supreme Court has spoken clearly that negligence <u>can</u> give rise to an

occurrence, and federal case law does not require us to find otherwise.

Cincinnati has not demonstrated as a matter of law that AMSCO expected

damage to result from any alleged negligence in its manufacturing process.  Thus,

we affirm the district court's holding that Cincinnati has a duty to defend

---

[3] Our order in a subsequent appeal in the same case, <u>Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.</u>, 478 F. App'x 493 (10th Cir. 2012), does not alter our analysis.  Although the property at issue on the second appeal was non-defective property damaged by water intrusion, the insured did not present any argument for the court to consider that the resultant damage was not an expected result of the insured's negligent construction.  <u>Id.</u> at 499–500.

AMSCO against the homeowner claims in active litigation.

II.     The Chapter 40 Proceedings Are Not "Suits" Under the Policies

Cincinnati's duty to defend AMSCO under the Policies extends only to "suits," which are defined as "civil proceeding[s] in which money damages because of . . . 'property damage' . . . to which this insurance applies are alleged." E.g., App. 206. The term "suit" encompasses:

> (a) An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent; (b) Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent; or (c) An appeal of a civil proceeding.

Id.

The district court held that the Nevada Chapter 40 process does not constitute a "suit" under the Policies unless Cincinnati consents to AMSCO's participation in alternative dispute resolution. Cincinnati Ins. Co., 921 F. Supp. 2d at 1239. The court explained that the Chapter 40 process contemplates a purely "informal" resolution of homeowner construction defect claims through notice, inspection, and an opportunity to repair, but the statute "does not itself provide for compulsory arbitration." Id.

A.      Chapter 40 Imposes Limited Consequences for Noncompliance

AMSCO argues that, although the Policies do not define the term "civil proceeding," this court should interpret it as encompassing the Chapter 40 prelitigation process. According to AMSCO, Chapter 40 proceedings (1) are not

"criminal"—and therefore, by contrast, should be considered "civil"; (2) relate to private rights and remedies; (3) involve formal statutory requirements; and (4) involve Special Masters, mediators, and potentially judges.  Aplee. Br. 65–66. However, AMSCO overlooks the key distinction between "civil proceedings" and the Chapter 40 process: while Chapter 40 purports to mandate participation by contractors, subcontractors, and suppliers, noncompliance does not result in any adverse judgment or obligation but rather imposes limited consequences in subsequent litigation.

Chapter 40 uses language traditionally interpreted as mandatory— specifically, the terms "must" and "shall"—to require contractors or suppliers to take certain actions in response to homeowner construction defect claims.  See, e.g., Nev. Rev. Stat. § 40.646(1) (stating that a contractor "shall" forward a copy of the claimant's notice of defects to each subcontractor or supplier reasonably believed to be responsible for a specified defect); id. § 40.646(3) (stating that a subcontractor or supplier "shall" inspect an alleged construction defect within 30 days of receiving notice from a contractor); id. § 40.6472 (stating that a contractor, subcontractor, or supplier "must" send a written response to a claimant who gives notice of a constructional defect).

However, parties who fail to comply with Chapter 40 face only limited consequences when a claimant's action eventually proceeds to state court.  For example, under § 40.650, if a contractor or supplier fails to send a written

response to a claimant—responding to each alleged construction defect and stating whether he has elected to repair the defect, offer monetary compensation, or disclaim liability for the defect—then Chapter 40's limitations on damages and defenses to liability in subsequent lawsuits are nullified.[4]  Id. § 40.650.  If a contractor or supplier fails to appear in mediation or refuses to mediate in "good faith," the mediator may choose to issue a report that is admissible in subsequent litigation.  Id. § 40.680(8).

These results, although serious, are not parallel to the often case-determinative consequences of noncompliance in the context of lawsuits or mandatory arbitrations.  Indeed, there are instances when a cost-benefit analysis would lead a contractor to "opt[] not to exercise its opportunity to repair" and encourage the claimant to commence litigation.  D.R. Horton, Inc. v. Eighth Judicial Dist. Ct., 168 P.3d 731, 740 n.31 (Nev. 2007).[5]

The minimal nature of the consequences of noncompliance by contractors, subcontractors, or suppliers is particularly evident in contrast to the stringent consequences of noncompliance by homeowner claimants.  A homeowner who

---

[4]  Chapter 40 damages are limited to reasonable attorney's fees, the reasonable cost of repairs, the reasonable cost of temporary housing necessary during the repair, the reduction in market value of the home due to structural failure, the loss of the use of all or part of the home, the reasonable value of other property damaged by the construction defect, and certain other costs reasonably incurred by the claimant.  Id. § 40.655.

[5]  AMSCO concedes that a party who is not insured during Chapter 40 proceedings might opt to push the matter to litigation.  Aplee. Br. 74.

files a civil action without following Chapter 40 prelitigation procedures will be unable to vindicate his claims in court; the court will dismiss the action, albeit without prejudice. Id. § 40.647. Also, if a contractor or supplier who is notified of a defect within a year of the closing of an initial home purchase fails to make timely repairs, the contractor or supplier is "immediately subject to discipline," id. § 40.672, including the suspension or revocation of his license, the imposition of monetary limits on his license, administrative fines of up to $10,000, and public reprimands. Id. § 624.300. Clearly, the Nevada legislature deemed it appropriate to impose harsh results for noncompliance with only certain aspects of the Chapter 40 process—none at issue here.

B. Section 40.649 Does Not Render Chapter 40 Proceedings "Suits"

AMSCO argues that Cincinnati's agreement to provide coverage in Nevada requires Cincinnati to comply with Nevada law, including a Chapter 40 provision stating that an insurer must treat a Chapter 40 claim like a civil action. Aplee. Br. 71–72 (citing Nev. Rev. Stat. § 40.649 (an insurer "[m]ust treat the claim as if a civil action has been brought against the contractor" and "[m]ust provide coverage to the extent available under the policy of insurance as if a civil action has been brought against the contractor")). In a footnote, the district court explained that Nevada's attempt to dictate the meaning of insurance policy language "by legislative fiat" is irrelevant because the parties agree that Utah law governs the construction of the Policies. Cincinnati Ins. Co., 921 F. Supp. 2d at

1239 n.28.  We agree.

Utah law governs how this court interprets the Policies, including how we interpret the term "suit" in the context of an insurer's duty to defend.  A rule of construction imposed by a Nevada statute is not binding—despite the relation of that rule to the contract provision at issue.  And, the Nevada legislature's policy decisions about how best to encourage compliance with its pretrial procedures do not apply in Utah.  This is especially so given that courts in other states have held that similar prelitigation proceedings are not suits as defined by similar language in CGL policies.  Hardesty Builders, Inc. v. Mid-Continent Cas. Co., No. C–10–142, 2010 WL 5146597, at *7–9 (S.D. Tex. Dec. 13, 2010) (unpublished).

Further, contrary to AMSCO's contention, principles of comity do not require us to apply Nevada's rule of construction to insurance policies purchased and issued in Utah, for which all premiums were paid in Utah, and which concern manufacturing activities taking place in Utah.  The decision to apply comity is fact-sensitive and rests "within the sound discretion of the trial court."  Jackett v. L.A. Dep't of Water & Power, 771 P.2d 1074, 1075 (Utah Ct. App. 1989). AMSCO has not shown that the district court abused its discretion in declining to apply § 40.649.  Cf. In re Colo. Corp., 531 F.2d 463, 469 (10th Cir. 1976) (analyzing denial of a grant of comity to orders of foreign courts under an abuse of discretion standard).

Because we believe it is clear that the Chapter 40 prelitigation process does

- 17 -

not constitute a "suit" under the Policies, we need not address the parties' arguments about whether Chapter 40 claims allege money damages. Also, we conclude by noting that, even if we could consider the Chapter 40 prelitigation process to be a civil proceeding, it would be an "alternative dispute resolution proceeding" as described in the Policies. App. 206; see also Gonski v. Second Judicial Dist. Ct. of State ex rel. Washoe, 245 P.3d 1164, 1171 (Nev. 2010) (describing the purpose of Chapter 40 as to "encourage homeowners and contractors to resolve their disputes before resorting to the courts"). The Policies require Cincinnati to defend AMSCO against claims in such proceedings only if Cincinnati has consented to AMSCO's participation, which it has not done here.

Finally, AMSCO has filed a motion to certify to the Utah Supreme Court each of the issues raised by the parties on appeal. 10th Cir. R. 27.1(A); Utah R. App. P. 41. Because we perceive Utah law to provide sufficient guidance, we DENY the motion to certify.

AFFIRMED.

Entered for the Court

Paul J. Kelly, Jr.
Circuit Judge