# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 20, 2025

Lyle W. Cayce
Clerk

———————

No. 23-20034

———————

BPX Production Company, *formerly known as* Petrohawk Energy Corporation,

*Plaintiff—Appellant*,

*versus*

Certain Underwriters at Lloyd's London Subscribing to CGL, Policy No. ENGLO1800982; Certain Underwriters at Lloyd's London Subscribing to Umbrella, Policy No. ENGLO1800981,

*Defendants—Appellees*.

———————————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:22-CV-1058

———————————————————————

Before Richman, Haynes, and Duncan, *Circuit Judges*.

Priscila Richman, *Circuit Judge*:[*]

In this diversity action, BPX Production Company (BPX), as assignee of BJ Services, alleges that Certain Underwriters at Lloyd's London (Underwriters) breached their duties to defend and indemnify BJ Services in

———————————

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

bad faith.  Underwriters moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that (1) BPX failed to allege facts that indicate Underwriters' duty to defend was triggered, (2) BJ Services' bankruptcy precludes the duty-to-indemnify claim, and (3) Texas law does not recognize common-law bad-faith claims in this third-party context.  The magistrate judge, applying Texas law, granted Underwriters' motion.  BPX appealed.  We reverse in part and affirm in part.

## I

BPX, an oil and gas producer, was the operator of a well, the State Willie Vee 56-T3-6 W107H ("the well"), in Reeves County, Texas.  BPX hired BJ Services, an oilfield services company, to cement the production casing on the well.  However, BJ Services used the wrong components in the cement mix, resulting in the cement hardening prematurely and forming a 7,000-foot cement plug in the well.  Although BPX attempted to salvage the well, it ultimately had to abandon it and drill a replacement.

BPX demanded payment from BJ Services for the losses it incurred and invoked the dispute resolution procedure set forth by the Master Services Agreement (MSA) between BPX and BJ Services.[1]  The MSA provided that "[i]f a Dispute arises, the Parties shall attempt to resolve such Dispute through the following procedure."  First, "a Party must give written notice of the Dispute ('Notice of Dispute') to the other Party" and "request a meeting . . . ('Settlement Meeting')."  Second, "the Parties must participate in the Settlement Meeting within thirty (30) days following the issuance of the Notice of Dispute."  Third, "if the Dispute remains

---

[1] The MSA is formally titled a "Master Services Agreement for Goods and/or Services for: Hydraulic Fracturing Services and Related Services, Cementing Services, Acidizing Services."

unresolved following the Settlement Meeting, the Parties may proceed to resolve the Dispute in accordance" with the MSA's forum selection and "Conduct of Arbitration" clauses.

After receiving BPX's demand letter, BJ Services timely provided notice to its insurer—Underwriters—and demanded that they defend and indemnify BJ Services against BPX's claim. But Underwriters denied coverage under BJ Services' policies—CGL Policy No. ENGLO1800982 (CGL Policy) and Umbrella Policy No. ENGLO1800981 (Umbrella Policy).

Underwriters' denial letter cited two reasons for denying coverage under the policies.[2] First, the letter cited a provision excluding certain types of property damages arising out of BJ Services' operations. Second, the letter cited BJ Services' failure to comply with certain requirements for obtaining protection under a supplemental endorsement to the CGL Policy. Underwriters did not state any other reasons for denying their "obligation to indemnify or provide coverage to [BJ Services] for the claim asserted by [BPX]," but they "reserve[d] the right to supplement [their] coverage position under the policies in the event additional information is developed or is disclosed." They also "reserve[d] the right to assert policy provisions or defenses not discussed in th[e] [denial] letter" and stated that nothing should be "construed as a waiver."

Notwithstanding Underwriters' denial, BPX and BJ Services engaged in settlement discussions in June 2020. The following month, however, BJ Services filed for Chapter 11 bankruptcy. It was not until January 2022 that the bankruptcy judge approved a settlement between BPX and BJ Services. Memorializing this settlement, the bankruptcy judge issued a "Stipulation

---

[2] While these reasons primarily related to the CGL Policy, the letter cited similar reasons for denying coverage under the Umbrella Policy.

and Agreed Order Assigning Insurance Claims to BPX Production Company." Under the order, BJ Services assigned to BPX any and all "rights, claims, and causes of action" that BJ Services had against Underwriters "relating to or arising out of [Underwriters'] failure and refusal to defend and indemnify BJ [Services] for BPX's claims and demand for loss and damages" relating to the Well. In return, BPX released its claims against BJ Services "for any loss or damages arising from or related to BJ's work."

BPX, as assignee of BJ Services, then brought suit in state court. The case was removed to federal district court, and this diversity action against Underwriters proceeded. BPX alleges that Underwriters breached their: (1) contractual promises to defend and indemnify BJ Services under the CGL and Umbrella Policies; (2) duty of good faith and fair dealing; and (3) statutory obligations under Chapter 541 of the Texas Insurance Code.[3] BPX also sought a declaratory judgment holding that BJ Services was negligent in its work on the well and that Underwriters wrongfully denied their duty to defend and indemnify BJ Services in connection with BPX's claim. The parties agreed to proceed before a magistrate judge for all proceedings, including final judgment.

Underwriters moved to dismiss BPX's claims under Federal Rule of Civil Procedure 12(b)(6), and the magistrate judge granted the motion. BPX timely appealed.

_____

[3] BPX recognizes that its claim under Chapter 541 of the Texas Insurance Code is now precluded by a recent decision from the Supreme Court of Texas. Ten days after dismissal of the claim, the Supreme Court of Texas definitively held that these types of claims "may not be assigned." *Tex. Med. Res., LLP v. Molina Healthcare of Tex., Inc.*, 659 S.W.3d 424, 439 (Tex. 2023).

No. 23-20034

## II

"We review orders on 12(b)(6) motions to dismiss for failure to state a claim *de novo*."[4] "We accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff."[5] We must also consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."[6] To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[7] A claim is plausible if the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[8]

## A

While the insurance policies specify that New York law governs, the parties agreed in the district court that they were unaware of any significant differences between the laws of New York and Texas on the relevant issues. Neither party now argues that New York law should apply. Accordingly, we apply Texas law to this diversity-jurisdiction case[9] and begin by addressing BPX's claim that Underwriters breached their duty to defend BJ Services.

---

[4] *Petrobras Am., Inc. v. Samsung Heavy Indus. Co.*, 9 F.4th 247, 253 (5th Cir. 2021).

[5] *Id.* (citing *Arnold v. Williams*, 979 F.3d 262, 265 n.1, 266 (5th Cir. 2020)).

[6] *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)).

[7] *In re Life Partners Holdings, Inc.*, 926 F.3d 103, 116 (5th Cir. 2019) (internal quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

[8] *Ashcroft*, 556 U.S. at 678.

[9] *See Emps. Ins. of Wausau v. Occidental Petroleum Corp.*, 978 F.2d 1422, 1430 n.8 (5th Cir. 1992) (stating that a party intending to raise a choice-of-law issue has an obligation to call the applicability of another forum's law to the court's attention).

No. 23-20034

Under Texas law, the duty to defend requires the insurer to defend the insured in any lawsuit that "alleges and seeks damages for an event potentially covered by the policy."[10] An insurer's duty to defend is determined by the eight-corners rule—"solely by the facts alleged in the petition and the terms of the policy."[11]

Under the CGL Policy, Underwriters had the "right and duty to defend the insured against any 'suit,'" which the policy defined as follows:

> "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes: . . . [a]ny other alternative dispute resolution proceeding in which [property] damages are claimed and to which the insured submits with our consent.[12]

In their motion to dismiss and on appeal, Underwriters solely rely on this language to argue that their duty to defend was never triggered.[13]

Relying on the policy's definition of "suit," Underwriters argue the settlement discussions between BPX and BJ Services were not "alternative dispute resolution proceedings," and even if they were, BJ Services never

---

[10] *Colony Ins. Co. v. Peachtree Constr., Ltd.*, 647 F.3d 248, 252-53 (5th Cir. 2011) (quoting *D.R. Horton–Texas, Ltd. v. Markel Int'l Ins. Co.*, 300 S.W.3d 740, 743 (Tex. 2009)).

[11] *Id.* at 253 (citing *Pine Oak Builders, Inc. v. Great Am. Lloyds Ins. Co.*, 279 S.W.3d 650, 654 (Tex. 2009)).

[12] While BPX originally suggested in its First Amended Complaint that the Umbrella Policy included a duty to defend, BPX expressly abandoned that claim by acknowledging that the Umbrella Policy does not include a duty to defend.

[13] In other words, they do not defend their coverage decision on the grounds asserted in their denial letter.

obtained Underwriters' consent.  Therefore, Underwriters believe there was never a "suit" that triggered their duty to defend.  We disagree.

**1**

First, the settlement negotiations between BPX and BJ Services constitute "alternative dispute resolution proceedings" as defined in the CGL Policy.  Black's Law Dictionary defines "alternative dispute resolution" as "[a]ny procedure for settling a dispute by means other than litigation, as by arbitration or mediation."[14]  The MSA sets forth a formal process for resolving disputes between BJ Services and BPX by means other than litigation; it requires written notice, a request for a meeting, and participation in the settlement meeting.  Several jurisdictions have concluded that similarly mandated settlement negotiation procedures, albeit statutorily required instead of contractually required, constitute "alternative dispute resolution proceedings" under identical policy language.[15]  Accordingly, we conclude the contractually required settlement negotiations in this case is an "alternative dispute resolution proceeding" under the CGL Policy.

Underwriters rely on two cases to argue otherwise—the Tenth Circuit's unpublished opinion in *Cincinnati Insurance Co. v. AMSCO*

---

[14] *Alternative Dispute Resolution*, Black's Law Dictionary (11th ed. 2019).

[15] We have "recognized that, where the state's highest court has not provided clear guidance, we may look to the rule in other jurisdictions in conducting our *Erie* analysis." *Hanson Prod. Co. v. Americas Ins. Co.*, 108 F.3d 627, 631 (5th Cir. 1997); *see, e.g.*, *Altman Contractors, Inc. v. Crum & Forster Specialty Ins. Co.*, 232 So. 3d 273, 278 (Fla. 2017) (holding that statutorily required "notice and repair process" was an "alternative dispute resolution proceeding" under CGL policy); *Melssen v. Auto-Owners Ins. Co.,* 285 P.3d 328, 335 (Colo. Ct. App. 2012) (same).

*Windows*[16] and our court's unpublished decision in *Meyers Warehouse, Inc. v. Canal Indemnity Co.*[17]  Neither are persuasive.

In *Cincinnati Insurance Co.*, the Tenth Circuit interpreted an identical policy definition of "suit" to encompass only those "alternative dispute resolution proceedings" that constitute "civil proceedings."[18]  The Tenth Circuit then concluded that Nevada's statutorily required settlement process did not satisfy the definition of suit in the policy because it only imposed "limited consequences for noncompliance" and therefore was not a "civil proceeding."[19]

Unlike the Tenth Circuit, we interpret this policy language as broadening the definition of "suit" to encompass any other "alternative dispute resolution proceeding" regardless of whether it is a "civil proceeding."  The Florida Supreme Court has also departed from the Tenth Circuit's interpretation.  In *Altman Contractors, Inc. v. Crum & Forster Specialty Ins. Co.*,[20] the Florida Supreme Court evaluated an identical policy definition of "suit" and conceded that a statutory pre-suit process was not a "civil proceeding."  It noted, however, that "the policy broaden[ed] the definition of suit to include[] [a]ny other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent."[21]  The Florida Supreme Court went on to

_____

[16] 593 F. App'x 802 (10th Cir. 2014) (unpublished).

[17] 614 F. App'x 719 (5th Cir. 2015) (unpublished).

[18] *Cincinnati Ins. Co.*, 593 F. App'x at 809.

[19] *Id.* at 809-10.

[20] 232 So. 3d 273, 278 (Fla. 2017).

[21] *Id.* (second and third alterations in original) (internal quotation marks omitted).

conclude the statutorily required "notice and repair process" was an "alternative dispute resolution proceeding" under the policy language.[22]

Furthermore, under Texas law, "if a contract of insurance is susceptible of more than one reasonable interpretation, we must resolve the uncertainty by adopting the construction that most favors the insured."[23] The differing conclusions between the Tenth Circuit and the Florida Supreme Court demonstrate ambiguity in the policy's definition of suit.[24] Resolving the ambiguity in favor of the insured, the policy language broadens the definition of "suit" beyond civil proceedings, encompassing other "alternative dispute resolution proceedings." Since the Tenth Circuit's holding in *Cincinnati Insurance Co.* was premised on the notion that the definition of "suit" only encompassed "civil proceedings,"[25] Underwriters' reliance on the case is unpersuasive.

Turning to *Meyers Warehouse, Inc. v. Canal Indemnity Co.*, Underwriters cite this case for the proposition that an "informal settlement negotiation that precedes the commencement of any civil proceeding is not

---

[22] *Id.*

[23] *Nat'l Union Fire Ins. Co. of Pittsburgh v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991) (citing *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 665 (Tex. 1987)); *see also Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660, 668 (Tex. 2008) ("Exceptions or limitations on liability are strictly construed against the insurer and in favor of the insured, and [a]n intent to exclude coverage must be expressed in clear and unambiguous language.") (alteration in original) (internal quotations omitted) (quoting *Nat'l Union Fire*, 811 S.W.2d at 555).

[24] *Cf. Hardesty Builders, Inc. v. Mid-Continent Cas. Co.*, No. CIV.A. C-10-142, 2010 WL 5146597, at*7-8 (S.D. Tex. Dec. 13, 2010) (unpublished) ("At best, [the State Sponsored Inspection Process] falls under the Policy term: "any other alternative dispute resolution proceeding in which such damages are claimed."), *aff'd*, 453 F. App'x 471 (5th Cir. 2011).

[25] *Cincinnati Ins. Co.*, 593 F. App'x at 809-10.

covered by the terms of the [insurance] contract." The policy language in *Meyers* was identical to the policy language in BJ Services' CGL Policy.[26] In that case, we concluded that the "informal" settlement negotiations between the insured and their customer did not fit the definition of "suit" in the contract.[27] However, as the magistrate judge in this case correctly pointed out, unlike *Meyers Warehouse*, the settlement negotiations between BPX and BJ Services were not "informal." Here, the settlement negotiations were conducted pursuant to a contractually required process. Accordingly, they were "alternative dispute resolution proceedings" as defined by the policy.

**2**

Second, Underwriters waived the policy's consent-to-suit requirement. Under Texas law, "[i]nsurers who wrongfully refuse to defend their insureds lose the benefit of their policies' procedural requirements."[28] Furthermore, at least one other jurisdiction has applied a similar rule to identical consent-to-suit language.[29] The magistrate judge did not address whether Underwriters' reasons for denying coverage as listed in the denial letter were correct, and Underwriters have not made any attempt to defend their coverage decision. Accordingly, at least at this point in the litigation,

---

[26] *Meyers Warehouse, Inc. v. Canal Indem. Co.*, 614 F. App'x 719, 722 (5th Cir. 2015) (unpublished).

[27] *Id.*

[28] *Enserch Corp. v. Shand Morahan & Co., Inc.*, 952 F.2d 1485, 1496 n.17 (5th Cir.), *as clarified on denial of reh'g* (Mar. 9, 1992).

[29] *See Melssen v. Auto-Owners Ins. Co.* 285 P.3d 328, 336 (Colo. Ct. App. 2012) (holding an insurer waives its right to argue that its insured failed to obtain the insurer's consent to suit when the insured fails to obtain it "because the insured reasonably believes the insurer has denied coverage on other grounds.").

we accept BPX's allegation that Underwriters' grounds for denying coverage, other than the consent-to-suit requirement, are not well-founded.[30]

Underwriters contend the waiver-by-wrongful-denial principle does not extend to consent-to-suit requirements in Texas. Relying on a federal district court opinion—*Nautilus Insurance Co. v. Concierge Care Nursing Centers, Inc.*[31]—they argue that Texas courts do not universally expand waiver to all policy provisions including a consent component. The *Nautilus* decision, however, only addressed anti-assignment clauses and distinguished anti-assignment clauses from "condition precedent[s] or [] procedural requirement[s] governing how claims are handled," noting anti-assignment clauses affect "whether a plaintiff has standing."[32] Indeed, the court recognized "Texas courts make a clear distinction between anti-assignment clauses and 'settlement-without-consent' and *similar* clauses."[33] Unlike the anti-assignment clause in *Nautilus*, the consent-to-suit clause in this case is "similar" to settlement-without-consent clauses to which waiver-by-wrongful-denial applies—both clauses "deal[] with the insured's duties after a loss that are conditions precedent to coverage."[34]

The policy rationale undergirding the waiver-by-wrongful-denial principle in Texas law applies equally to consent-to-suit clauses. We

---

[30] It is worth noting that an insurer's reliance on a procedural requirement as a defense to coverage only matters if the coverage denial is otherwise wrongful. If the coverage denial was not otherwise wrongful, then there would not have been coverage regardless of whether the procedural requirement was met.

[31] 804 F. Supp. 2d 557 (S.D. Tex. 2011).

[32] *Id.* at 559.

[33] *Id.* at 560 (emphasis added) (citing *Keller Founds., Inc. v. Wausau Underwriters Ins. Co.*, 626 F.3d 871, 876 (5th Cir.2010)).

[34] *Id.* at 559.

No. 23-20034

examined the rationale behind "the waiver of consent clauses" under Texas law in *Scottsdale Insurance Co. v. Knox Park Construction, Inc.*,[35] which dealt with a consent-to-settlement clause.[36] Quoting the Supreme Court of Texas, we explained the policy as follows:

> The rationale behind holding to this particular waiver theory is that a claimant should not be required to approach his insurer, hat in hand, and request consent to settle with another when he has already been told in essence, that the insurer is not concerned, and he is to go his way. It is difficult to see why an insurer should be allowed, on the one hand, to deny liability and thus, in the eyes of the insured breach his contract and, at the same time, on the other hand, be allowed to insist that the insured honor all his contractual commitments . . . . [I]n the case of existent, denied liability the denial is a breach of contract on the part of the insurer and its breach should[,] by rights, relieve the insured of the punitive effects of his failure to comply with consent provisions of the insurance policy.[37]

Applying the waiver-by-wrongful-denial rule, we then concluded that the insurer in that case could not "invoke the Consent Clause while simultaneously refusing to cover breach of warranty damages" based on "its erroneous" coverage determination.[38]

---

[35] 488 F.3d 680 (5th Cir. 2007).

[36] *Id.* at 688.

[37] *Id.* (alterations in original) (omission in original) (quoting *Ford v. State Farm Mut. Auto. Ins. Co.*, 550 S.W.2d 663, 666 (Tex. 1977)).

[38] *Id.* at 689.

Assuming Underwriters' denial of coverage was wrongful, the waiver-of-consent rule also applies here. They had an opportunity to assert their right to consent in their denial letter and failed to do so. After Underwriters' blanket denial of coverage, BJ Services did not have an incentive to obtain Underwriters' consent. Indeed, it would have been paradoxical for BJ Services to have sought Underwriters' consent to suit after they had already said the policy did not cover BPX's claim. Conversely, if Underwriters had initially denied coverage based on their lack of consent to the settlement negotiations, BJ Services could have cured the defect by either seeking their consent or ensuring BPX brought a lawsuit. A New York court said it well: "after repudiating liability" on other grounds, the insurer should not be able to "create grounds for its refusal to [defend] by demanding compliance" with procedural requirements.[39] Accordingly, Underwriters waived the consent-to-suit requirement by failing to assert it in their denial letter and otherwise refusing coverage.

The magistrate judge dismissed BPX's duty-to-defend claim based solely on his conclusion that BPX failed to allege that Underwriters either consented to the settlement negotiations or waived the consent requirement and Underwriters do not attempt to defend their coverage decision on any other ground. Since we conclude that Underwriters waived the consent-to-suit requirement by not asserting it in their denial letter, the magistrate judge's dismissal of BPX's duty-to-defend claim was not well-founded.

**B**

We next address BPX's duty-to-indemnify claim. Under Texas law, "an insurer's duties to defend and indemnify its insured are 'distinct and

---

[39] *King v. State Farm Mut. Auto. Ins. Co.*, 218 A.D.2d 863, 864-65 (N.Y. App. Div. 1995).

separate duties.'"[40]  The duty to indemnify requires the insurer to "pay all covered claims and judgments against an insured."[41]  In contrast to the duty to defend, "an insurer's duty to indemnify generally cannot be ascertained until the completion of litigation, when liability is established, if at all."[42]

There has not been an adjudication as to BJ Services' liability to BPX. Nonetheless, BPX argues that, under *Great American Insurance Co. v. Hamel*,[43] it can litigate both the underlying liability of BJ Services and Underwriters' coverage.  We agree.

In *Hamel*, the Supreme Court of Texas recognized that, in some circumstances, both the underlying liability of the insured to a third party (in this case, BJ Services to BPX) and the insurer's obligation to indemnify for any resulting actions (in this case, Underwriters' coverage responsibilities) may be determined in the same litigation.[44]  The Court in *Hamel* held that third-party claimants and insurers can "litigat[e] the underlying liability issues" in a "coverage suit" when an insurer wrongfully refuses its duty to defend the insured.[45]

While there was a prior judgment holding the insured liable in *Hamel,* the Court concluded it was not the result of a fully adversarial proceeding and

---

[40] *Colony Ins. Co. v. Peachtree Constr., Ltd.*, 647 F.3d 248, 252 (5th Cir. 2011) (quoting *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 821-22 (Tex. 1997)).

[41] *Id.* at 253 (quoting *D.R. Horton–Texas, Ltd. v. Markel Int'l Ins. Co.*, 300 S.W.3d 740, 743 (Tex. 2009)).

[42] *Id.* (citing *Farmers Tex. Cnty. Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 84 (Tex. 1997)).

[43] 525 S.W.3d 655 (Tex. 2017).

[44] *Id.* at 671 (stating that "the Insurance Suit gives the parties the opportunity to litigate any disputed underlying issues with the benefit of full adversity").

[45] *Id.* at 669.

therefore did not bind the insurer.[46]  Accordingly, the Court's reasoning extends the *Hamel* doctrine to this scenario as well, in which BJ Services' liability was never determined because the claims were settled without any admission as to liability.  The Supreme Court of Texas explained why "an insurer's wrongful refusal to defend presents a compelling reason to" allow the insured's liability to be determined in a coverage suit:

> An insurer's refusal to defend or to even attempt to litigate its duties while the underlying suit is pending carries significant risks, and for good reason.  It places the burden on the insured to defend itself, often without adequate resources to do so.  It can also leave the plaintiff in an untenable position.  The defendant's insurer is often the plaintiff's only real source of recovery, but without the insurer's involvement in the lawsuit the likelihood of a fully adversarial trial diminishes substantially. . . . To some degree, the parties' conduct is simply an attempt to make the best of a situation that [the insurer] created by refusing to defend.[47]

In this case, BPX settled its claims against BJ Services for the opportunity to recover against Underwriters, which was BPX's "only real source of recovery" given BJ Services' bankruptcy.[48]  BPX did not attempt to adjudicate the issue of liability with BJ Services.  Moreover, BJ Services likely did not have "adequate resources" "to defend itself" since

---

[46] *Id.* at 666, 669; *see also Eagle Supply & Mfg. L.P. v. Landmark Am. Ins. Co.*, 630 S.W.3d 342, 348, 354 (Tex. App.—Eastland 2021, pet. denied) (permitting the third-party plaintiff—who had been assigned the insured's rights against the insurer—"to litigate the underlying liability and damage issues in a subsequent suit, including whether [the insurers] breached a duty to defend [the insured].").

[47] *Hamel*, 525 S.W.3d at 668-69 (internal citations omitted).

[48] *See id.*

Underwriters denied coverage.[49]    Accordingly, any judgment that BPX would have obtained from BJ Services would likely not have been the result of a fully adversarial trial and therefore not binding on Underwriters. Even if BPX obtained a judgment against BJ Services, BPX and Underwriters would be "back to square one" on the issue of liability.[50]

A decision from a Texas intermediate appellate court in *Eagle Supply & Manufacturing L.P. v. Landmark American Insurance Co.*[51] demonstrates the potential for unnecessary duplicative litigation in this type of scenario. In that case, the Texas appellate court, applying *Hamel*, determined that the "judgments that [the third-party plaintiff] obtained against [the insured] in the bankruptcy court and in the trial court below were not the result of a fully adversarial trial" and therefore not binding on the insurer.[52]  Nonetheless, the court permitted the third-party plaintiff—who had been assigned the insured's rights against the insurer—"to litigate the underlying liability and damage issues in a subsequent suit, including whether [the insurers] breached a duty to defend [the insured]."[53]  In this case, however, by assigning BJ Services' insurance claims to BPX before adjudicating BJ Services' liability to BPX, the bankruptcy court simply avoided wasting BJ Services' bankruptcy assets on defending a claim that would later be nullified.

_____

[49] *See id.*

[50] *Eagle Supply*, 630 S.W.3d at 354 (explaining the *Hamel* doctrine "[i]n laymen's terms" as sending the parties "back to square one" after a less than "fully adversarial trial").

[51] 630 S.W.3d 342 (Tex. App.—Eastland 2021, pet. denied).

[52] *Id.* at 354.

[53] *Id.* at 348, 354.

The fact that BPX could not recover from BJ Services or its bankruptcy assets does not preclude its duty-to-indemnify claim. In the "Stipulation and Agreed Order Assigning Insurance Claim to BPX Production Company," the bankruptcy court recognized "BPX failed to file a proof of claim in BJ's [C]hapter 11 case and therefore [was] unable to recover against the bankruptcy estate of BJ directly and only ha[d] potential recourse against the Underwriters directly." Nonetheless, the bankruptcy court ordered the Wind-Down Trustee and the Liquidation Trustee to "assign to BPX all of their and [BJ Services'] rights, claims, and causes of action against the Underwriters . . . relating to or arising out of the liability insurance carriers' failure and refusal to defend and indemnify BJ against BPX's claims." This assignment was in "full satisfaction of" BPX's claims against BJ Services. "For the avoidance of doubt," the bankruptcy court ordered that "BPX shall not file any proof of claim in BJ's [C]hapter 11 case [and] shall not seek authority to file a late proof of claim." The magistrate judge believed this order precluded BPX's duty-to-indemnify claim because the order "expressly prevents BPX from suing BJ Services for damages."

In *In re Edgeworth*,[54] however, we concluded "that it makes no sense to allow an insurer to escape coverage for injuries caused by its insured merely because the insured receives a bankruptcy discharge" and "a plaintiff's failure to file in the bankruptcy proceeding should not impair the right to file suit against another party who may be liable on the debt."[55] In that case, a physician received a bankruptcy discharge, but plaintiffs who did not participate in the bankruptcy case nonetheless filed a medical malpractice

---

[54] 993 F.2d 51 (5th Cir. 1993).

[55] *Id.* at 54-55 (citing *Green v. Welsh*, 956 F.2d 30, 35 (2d Cir. 1992); *In re Jet Florida Sys., Inc.*, 883 F.2d 970, 974-75 (11th Cir. 1989); *In re White*, 73 B.R. 983, 984 (Bankr. D.D.C. 1987); *In re Mann*, 58 B.R. 953, 959 (Bankr. W.D. Va. 1986)).

claim against the physician for events arising before the physician's bankruptcy filing.[56] To enforce the discharge, the bankruptcy court enjoined the lawsuit.[57] We reversed.[58] We held the plaintiffs "may pursue their lawsuit against [the physician] in order to collect any judgment solely from the proceeds of his malpractice liability policy" because the bankruptcy discharge does not bar "such liability-fixing suits even if a plaintiff has agreed to foreswear recovery from the debtor personally and to look only to the policy proceeds."[59]

The same holds true in this case. The bankruptcy court's order does not "allow [Underwriters] to escape coverage for injuries caused by [BJ Services]" merely because BPX has agreed to "foreswear recovery from [BJ Services] personally."[60] The bankruptcy court's order only prevents BPX from seeking damages from BJ Services and shifts the costs of litigation away from the bankruptcy estate[61]—a tactic that the bankruptcy court is free to use in this situation when the insurer has already denied coverage and the bankruptcy estate would have to bear the costs of the defense. Indeed, as the Supreme Court of Texas pointed out in *Hamel*: "To some degree, the

---

[56] *Id.* at 53.

[57] *Id.*

[58] *Id.* at 56.

[59] *Id.* at 53-54.

[60] *Id.* at 54-55.

[61] *See Edgeworth*, 993 F.2d at 54 ("[A]llowing commencement or continuation of such [liability-fixing] actions does not inequitably burden the debtor. Burden there is, in the sense that attending depositions and trial may take up [the physician's] time. But this is not a burden alleviated by § 524 when the purpose of the suit is to establish [the physician]'s nominal liability in order to collect from his insurance policy.").

parties' conduct is simply an attempt to make the best of a situation that [the insurer] created by refusing to defend."[62]

Further, BPX's "failure to file in the bankruptcy proceeding should not impair [its] right to file suit against" Underwriters.[63]  In *Edgeworth*, it was immaterial that neither the physician nor his bankruptcy estate would be personally liable to the plaintiffs.[64]  Despite not filing a claim in the physician's bankruptcy, the plaintiffs were still able to bring a medical malpractice claim to recover under the physician's insurance policy after his discharge.[65]  Here too, the fact that BPX cannot recover from BJ Services or its bankruptcy estate is immaterial to BPX's ability to assert a claim against Underwriters in light of the assignment of BJ Services's claims to BPX. Additionally, here BPX did engage to some extent in the bankruptcy court, as that court approved the settlement agreement.  Accordingly, we reverse the magistrate judge's dismissal of BPX's duty-to-indemnify claim.

## C

The magistrate judge correctly dismissed BPX's extra-contractual duty-of-good-faith claim.  Texas courts do not recognize duty-of-good-faith claims in the third-party context.  For instance, in *Maryland Insurance Co. v. Head Industrial Coatings & Services, Inc.*,[66] the insureds assigned their claims against their insurer to a third party as part of a settlement of the third party's

---

[62] *Great Am. Ins. Co. v. Hamel*, 525 S.W.3d 655, 669 (Tex. 2017).

[63] *Edgeworth*, 993 F.2d at 55 (citing *Green v. Welsh*, 956 F.2d 30, 35 (2d Cir. 1992); *In re Jet Florida Sys., Inc.*, 883 F.2d 970, 974-75 (11th Cir. 1989); *In re White*, 73 B.R. 983, 984 (Bankr. D.D.C. 1987); *In re Mann*, 58 B.R. 953, 959 (Bankr. W.D. Va. 1986)).

[64] *Id.* at 54-55.

[65] *Id.*

[66] 938 S.W.2d 27 (Tex. 1996) (superseded by statute on other grounds).

personal injury suit.[67]  The third party then asserted several claims, including a "breach of the duty of good faith and fair dealing" based on the insurer's "refusal to defend."[68]  The Supreme Court of Texas rejected the bad faith claim, noting "Texas law recognizes only one tort duty in this context, that being the duty stated in *Stowers*[69]."[70]

Similarly, in *Mid-Continent Insurance Co. v. Liberty Mutual Insurance Co.*,[71] the Supreme Court of Texas concluded a co-insurer that was subrogated to the insured's rights against another insurer could only assert a *Stowers* claim.[72]  It pronounced: "An insurer's common law duty in this third party context is limited to the *Stowers* duty to protect the insured by accepting a reasonable settlement offer within policy limits.  *Stowers* is the only common law tort duty in the context of third party insurers responding to settlement demands."[73]

To the extent that BPX argues it has a valid *Stowers* claim, the magistrate judge similarly did not err in dismissing it.  Under the *Stowers* doctrine, "an insurer has a common-law duty to settle third-party claims

---

[67] *Id.* at 27-28.

[68] *Id.* at 28.

[69] *G.A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544, 547 (Tex. Comm'n App. 1929).

[70] *Md. Ins.*, 938 S.W.2d at 28.  The Supreme Court of Texas adopted the reasoning expressed in the concurring opinion in *Texas Farmers Insurance Co. v. Soriano*, 881 S.W.2d 312, 318 (Tex. 1994), which explained that "the 'no reasonable basis' standard applicable to the duty of good faith and fair dealing in the first-party context is the wrong test for third-party duty-to-settle claims."  *Soriano*, 881 S.W.2d at 319 (Cornyn, J., concurring).

[71] 236 S.W.3d 765 (Tex. 2007).

[72] *Id.* at 776.

[73] *Id.* (internal citations omitted) (citing *Md. Ins.*, 938 S.W.2d at 28; *Stowers*, 15 S.W.2d at 547).

against its insureds when it is reasonably prudent to do so."[74] "The [*Stowers*] duty arises when (1) the third party's claim against the insured is within the scope of coverage; (2) the settlement demand is within policy limits; and (3) the terms of the demand are 'such that an ordinarily prudent insurer would accept it, considering the likelihood and degree of the insured's potential exposure to an excess judgment.'"[75] Finally, there must actually be "liability in excess of policy limits."[76]

Unlike the duty-to-indemnify claim, BJ Services' bankruptcy forecloses any *Stowers* claim because *Stowers* claims require "harm or legal injury to the insured."[77] In other words, there must be actual liability imposed on the insured in excess of policy limits. We addressed this issue in *In re Davis*.[78] In that case, after the insured filed for bankruptcy, an insurer sought a declaratory judgment that "no *Stowers* claim exists or will exist in the bankruptcy estate."[79] The bankruptcy court had permitted the underlying litigation between the third party and the insured to continue while the insured was in bankruptcy proceedings, which ultimately resulted in the insured being held liable in excess of the policy limits.[80] Nonetheless, we held that the insured's "bankruptcy discharge more than two years prior

---

[74] *In re Farmers Tex. Cnty. Mut. Ins. Co.*, 621 S.W.3d 261, 267 (Tex. 2021) (citing *Phillips v. Bramlett*, 288 S.W.3d 876, 879 (Tex. 2009)).

[75] *Id.* (quoting *Bramlett*, 288 S.W.3d at 267).

[76] *Id.* ("[D]eclin[ing] to extend *Stowers* to cases in which there is no liability in excess of policy limits.").

[77] *In re Davis*, 253 F.3d 807, 810 (5th Cir. 2001) (citing *Foremost Cnty. Mut. Ins. Co. v. Home Indem. Co.*, 897 F.2d 754, 757 (5th Cir. 1990)).

[78] 253 F.3d 807 (5th Cir. 2001).

[79] *Id.* at 809.

[80] *Id.*

to the judgment . . . negates the existence of a *Stowers* claim. A *Stowers* claim requires both an insurer's negligent failure to settle, *and* subsequent harm or legal injury to the insured."[81] As we explained, "[e]ven assuming facts suggesting that [the insurer] negligently failed to settle the [insured's] claims, [the insured] has not suffered any legal injury cognizable under a *Stowers* cause of action because he is, due to the discharge, no longer personally liable to the [third party] for any judgment in excess of the amount covered by the insurance policy."[82]

This applies to the claims that BJ Services assigned to BPX in bankruptcy. BJ Services has now been discharged from any liability relating to BPX's claims, so there is no "subsequent harm or legal injury to [BJ Services]."[83] Accordingly, BPX does not have a valid *Stowers* claim against Underwriters. We affirm the magistrate judge's dismissal of BPX's extra-contractual common law claims.

## D

The magistrate judge dismissed the declaratory judgment claim because there was no "underlying legal action upon which BPX may receive relief." Since we reverse the magistrate judge's dismissal of BPX's duty-to-defend and duty-to-indemnify claims, we vacate the magistrate judge's

---

[81] *Id.* at 810 (citing *Foremost Cnty. Mut. Ins. Co. v. Home Indem. Co.*, 897 F.2d 754, 757 (5th Cir. 1990)).

[82] *Id.*

[83] *Id.*

No. 23-20034

dismissal of the declaratory judgment action and remand for further consideration.[84]

\* \* \*

We REVERSE the magistrate judge's dismissal of BPX's duty-to-defend and duty-to-indemnify claims, VACATE and REMAND BPX's declaratory judgment claim, and AFFIRM the magistrate judge's dismissal of BPX's common law bad-faith claim.

_____

[84] *See, e.g.*, *McCartney v. First City Bank*, 970 F.2d 45, 47 (5th Cir. 1992) ("Because we reverse and remand with respect to the claims under §§ 1692 and 1983, we also remand on this issue so the district court may exercise its discretion to decide whether granting of declaratory relief would be appropriate."); *Peters v. JP Morgan Chase Bank, N.A.*, 600 F. App'x 220, 224 (5th Cir. 2015) (unpublished) ("That [the plaintiff] has sufficiently pleaded a breach of contract cause of action also affects her declaratory judgment . . . . This claim can 'presently be litigated and decided' based on the facts before the district court and therefore states a claim for declaratory judgment.").